SUSAN M. HAYNES, ADMINISTRATRIX (ESTATE
OF BARBARA S. FREEMAN) *v.* YALE-NEW
HAVEN HOSPITAL ET AL.
(SC 15470)

Callahan, C. J., and Borden, Berdon, Katz, Palmer, McDonald and Peters, Js.[1]

---

[1] This case first was argued to this court before Chief Justice Callahan and Justices Borden, Berdon, Katz and McDonald on September 26, 1996. The panel was then expanded to include Justices Palmer and Peters, and the matter was reargued before the court en banc.

Argued February 20—officially released August 26, 1997

*James E. Swaine,* for the appellant (plaintiff).

*Mark R. Kravitz*, with whom were *Jeffrey R. Babbin* and, on the brief, *Penny Q. Seaman* and *Thomas J. Witt*, for the appellees (defendants).

*Philip J. O'Connor* filed a brief for the Connecticut Defense Lawyers Association as amicus curiae.

*Opinion*

BORDEN, J. The dispositive issues in this appeal are whether: (1) underinsured motorist benefits fall within the common-law collateral source rule; and (2) the medical malpractice allegations in the complaint are sufficient to state a claim for a violation of the Connecticut Unfair Trade Practices Act (CUTPA), General Statutes § 42-110a et seq. The plaintiff, Susan M. Haynes, as administratrix of the estate of her mother, the decedent Barbara S. Freeman, brought an action against the defendants, Yale-New Haven Hospital (Yale-New Haven) and Charles F. McKhann, a surgeon, alleging medical malpractice and CUTPA violations.[2] The trial court granted the defendants' motion for summary judgment and the plaintiff appealed from the judgment rendered thereon.[3] The plaintiff claims that the trial court improperly concluded that: (1) on the first count, the plaintiff could not prevail because of the common-law bar against double recovery for the same loss; and (2)

---

[2] The plaintiff also brought claims for wrongful retention of moneys paid for medical services rendered on behalf of the decedent by a federal agency, and for breach of an implied contract, both of which were subsequently withdrawn.

[3] The plaintiff appealed from the trial court's granting of the motion for summary judgment to the Appellate Court, and we transferred the appeal to this court pursuant to Practice Book § 4023 and General Statutes § 51-199 (c). After oral argument, this court ordered reargument en banc, and the filing of supplemental briefs limited to the following issue: "Under the circumstances of this case, should the $650,000 received by the plaintiff for her decedent's death be treated as: (1) a payment by a collateral source that does not bar the plaintiff's suit against the defendant Yale-New Haven Hospital; or (2) full compensation for the loss of the decedent's life that does bar the plaintiff's suit against the defendant Yale-New Haven Hospital?"

on the second count, the plaintiff's allegations were legally insufficient to state a CUTPA violation. We affirm the judgment of the trial court.

The record reveals the following facts. The plaintiff's decedent was employed as a rural letter carrier for the United States postal service. On May 14, 1986, while in the course of her duties as a postal worker, the decedent was seriously injured when her vehicle was struck head-on by a vehicle driven by Alan G. Perrier. An ambulance transported the decedent to Yale-New Haven for emergency medical treatment. She was admitted to Yale-New Haven's emergency department at approximately 12:40 p.m. and began receiving emergency medical care for a fractured left leg and a fractured pelvis. At approximately 2:15 p.m., after being in the care of the hospital for approximately one and one-half hours, the emergency room doctors noticed that the decedent was experiencing " 'an expanding abdominal girth.' " Upon this discovery, the decedent was transported to the operating room for emergency exploratory surgery. At approximately 2:30 p.m., McKhann began the surgery and, upon opening her abdomen, he discovered large amounts of blood as a result of the laceration of her spleen, which he then removed. During the surgery, however, the decedent's circulation failed and she went into cardiac arrest. McKhann was unable to resuscitate her heart and the decedent was pronounced dead at 3:41 p.m.

The plaintiff first brought an action against Perrier, the driver of the vehicle that had struck the decedent's vehicle, for wrongful death and other compensatory damages. The plaintiff received $20,000 from Perrier's insurer, an amount that represented the limit of his automobile liability insurance policy. After exhausting Perrier's policy coverage, the plaintiff then pursued a claim against Covenant Insurance Company (Covenant), the decedent's automobile insurance carrier,

which provided uninsured and underinsured motorist coverage (underinsured motorist coverage)[4] in the amount of $900,000. Unable to settle the matter, the parties submitted the plaintiff's underinsured motorist claim to arbitration under the provisions of the decedent's insurance policy. Covenant conceded Perrier's liability, and the parties stipulated that the only issue before the arbitration panel was the amount of damages for the decedent's wrongful death. A panel of three arbitrators determined the damages to be $650,000.[5] Covenant paid the plaintiff $630,000, after deducting the $20,000 that the plaintiff had recovered from Perrier's liability carrier.

The plaintiff then commenced this action against the defendants. In the medical malpractice count, the plaintiff sought damages against both defendants on the grounds that they allegedly had failed to meet the requisite standard of care in applying emergency room care to the decedent, that the emergency department was inadequately staffed, and that the existing staff was inadequately trained and supported. In the CUTPA count, against Yale-New Haven only, the plaintiff alleged that Yale-New Haven had engaged in unfair and deceptive trade practices because, although the hospital was certified as a major trauma center, it had failed to meet the requisite standards of care for such a center for essentially the same reasons stated in the medical malpractice count. The defendants filed a special

---

[4] Throughout this discussion, all references to "underinsured" motorist coverage encompass uninsured motorist coverage as well.

[5] Accordingly, because the plaintiff and Covenant stipulated before the arbitration panel that "the only issue is just damages for [the decedent's] death, the loss of earning capacity, conscious pain and suffering, [and] loss of enjoyment of life's activities," for purposes of this case the $650,000 award must be considered the full legal value of the damages. The plaintiff does not dispute this fact. Moreover, as a rule, the decision of an arbitration panel is binding as res judicata in a subsequent judicial proceeding. See, e.g., *Fink* v. *Golenbock*, 238 Conn. 183, 195, 680 A.2d 1243 (1996).

defense to the medical malpractice count, alleging that the plaintiff had already received full compensation for the harm suffered by the plaintiff's decedent. Yale-New Haven essentially denied the allegations of the CUTPA count.

The trial court granted the defendants' motion for summary judgment on the medical malpractice count because it concluded that as a result of the plaintiff's having been fully compensated for the death of her decedent, she was precluded from pursuing this claim against the defendants by the common-law rule barring a double recovery for the same injury. In addition, the trial court rendered summary judgment on the CUTPA count, based upon the reasoning that a malpractice claim cannot be recast as a CUTPA claim. This appeal followed.

I

We first address the plaintiff's argument that underinsured motorist benefits, because of their contractual nature, are not within the ambit of the common-law rule precluding double recovery for the same harm,[6] but, rather, come within the common-law collateral source rule.[7] Accordingly, the plaintiff argues that the trial

---

[6] The rule precluding double recovery is a "simple and time-honored maxim that [a] plaintiff may be compensated only once for his just damages for the same injury. . . . Plaintiffs are not foreclosed from suing multiple defendants, either jointly or separately, for injuries for which each is liable, nor are they foreclosed from obtaining multiple judgments against joint tortfeasors. . . . The possible rendition of multiple judgments does not, however, defeat the proposition that a litigant may recover just damages only once. . . . Double recovery is foreclosed by the rule that only one satisfaction may be obtained for a loss that is the subject of two or more judgments." (Citations omitted; internal quotation marks omitted.) *Gionfriddo* v. *Gartenhaus Cafe*, 211 Conn. 67, 71–73, 557 A.2d 540 (1989).

[7] "The collateral source rule provides that a defendant is not entitled to be relieved from paying any part of the compensation due for injuries proximately resulting from his act where payment [for such injuries or damages] comes from a collateral source, wholly independent of him. . . . The basis of [this] rule is that a wrongdoer shall not benefit from a windfall

court improperly rendered summary judgment on the malpractice count. The defendants argue that the trial court properly found the rule barring double recovery for a single harm to be controlling. We agree with the defendants.[8]

This case forces us to confront the tension between two competing principles. The first is that a tortfeasor should not be rewarded by collateral sources that have benefited an injured party. This principle recognizes the social value in making the tortfeasor pay the injured party even for already "compensated" losses in order to prevent a windfall to the tortfeasor; 2 S. Speiser, C. Krause & A. Gans, American Law of Torts (1985 & Sup. 1997) § 8.16, p. 526; and to fulfill the general tort policy of deterring similar tortfeasors from wrongful conduct. W. Prosser & W. Keeton, Torts (5th Ed. 1984) § 4, pp. 25–26. The second, competing principle is that a litigant may recover just damages for the same loss only once. The social policy behind this concept is that it is a

from an outside source. That rule is applicable . . . in any tort case." (Citations omitted; internal quotation marks omitted.) *Gurliacci* v. *Mayer*, 218 Conn. 531, 556–57, 590 A.2d 914 (1991).

[8] We acknowledge that many jurisdictions agree with the plaintiff that underinsured motorist benefits should be treated as a collateral source that does not affect the insured's right of recovery against a different tortfeasor. See, e.g., *International Sales-Rentals Leasing Co.* v. *Nearhoof*, 263 So. 2d 569, 571 (Fla. 1972) (joint tortfeasor not entitled to setoff equal to amount of recovery injured plaintiff received from his uninsured motorist coverage carrier); *Respess* v. *Carter*, 585 So. 2d 987, 988–90 (Fla. App. 1991) (same); *State Farm Mutual Automobile Ins. Co.* v. *Board of Regents of the University System of Georgia*, 226 Ga. 310, 311–12, 174 S.E.2d 920 (1970) (same). For the reasons expressed herein, however, we agree with those cases, though fewer in number, that hold to the contrary. See, e.g., *Petrella* v. *Kashlan*, 826 F.2d 1340, 1344 (3d Cir. 1987) (under New Jersey law, recovery on underinsured motorist coverage should be regarded as same as recovery from tortfeasor, because both dependent on there being underlying tort); *Cooper* v. *Aplin*, 523 So. 2d 339 (Ala. 1988) (satisfaction of litigated judgment against uninsured motorist carrier prevents subsequent action against other tortfeasors); *Waite* v. *Godfrey*, 106 Cal. App. 3d 760, 773, 163 Cal. Rptr. 881 (1980) (uninsured motorist benefits not collateral source).

waste of society's economic resources to do *more* than compensate an injured party for a loss and, therefore, the judicial machinery should not be engaged in shifting a loss in order to create such an economic waste. See, e.g., 4 G. Palmer, Law of Restitution (1978 & Sup. 1997) § 23.15, p. 437. The question we must decide is which of these two policies should control in the present case.

The plaintiff contends that this conflict is resolved by the contractual basis of underinsured motorist payments. She argues that, because Covenant's liability was based entirely upon its contract with the decedent, all payments made pursuant to the underinsured motorist insurance policy should be viewed as purely contractual in nature. Thus, according to the plaintiff, the collateral source rule should apply.

We are not persuaded that payments made pursuant to an underinsured motorist contract can be so easily classified. In our view, underinsured motorist benefits are sui generis. They are contractual, but they depend on principles of tort liability and damages. Whether in any particular case underinsured motorist benefits should be treated as are other types of insurance must depend on a case-by-case analysis of the underlying purpose and the principles that apply to such benefits.

It is true that Covenant would have had no liability to the plaintiff's decedent but for the existence of the insurance contract, and that, generally speaking, an action by an insured against an underinsured motorist carrier is in form "an action in contract." *Dodd* v. *Middlesex Mutual Assurance Co.*, 242 Conn. 375, 384, 698 A.2d 859 (1997). We do not dispute, moreover, that the collateral source rule would apply to various other contractual insurance payments, such as life, disability, or medical insurance. Underinsured motorist insurance, however, is unlike those traditional types of insurance, all of which pay upon proof of the occurrence of the

particular loss insured against, irrespective of the legal liability of others for causing that loss. Although in form first party insurance, underinsured motorist insurance operates in part as a surrogate for a third party who lacks sufficient liability insurance. It provides benefits only upon proof that a third party, namely, an underinsured motorist for whose liability it acts as a surrogate, was a tortfeasor who injured the insured. Moreover, the amount of an underinsured motorist payment is determined, within contractual limits, by the measure of tort damages. See *Williams* v. *State Farm Mutual Automobile Ins. Co.*, 229 Conn. 359, 368, 641 A.2d 783 (1994) (in order to recover under underinsured motorist policy, insured must prove amount of damages and that other motorist was underinsured and legally liable).

Thus, underinsured motorist benefits, although contractual in nature, operate in part as a liability insurance surrogate for the underinsured motorist third party tortfeasor. We recognize that an underinsured motorist carrier "is not the alter ego of the tortfeasor and . . . they do not share the same legal [status]." *Mazziotti* v. *Allstate Ins. Co.*, 240 Conn. 799, 817, 695 A.2d 1010 (1997). *Mazziotti*, however, dealt with the question of whether an insured's underinsured motorist insurance carrier and a third party tortfeasor should be deemed in privity with each other for purposes of the doctrine of collateral estoppel. Id., 810–19. The fact that the carrier and the tortfeasor do not share a *complete* legal identity, and thus are not in privity with each other, does not automatically resolve the narrower question of how payments made pursuant to an underinsured motorist policy should be treated.

We do not mean to imply that claims for underinsured motorist payments must be viewed solely as sounding in tort, and not in contract. Neither classification is

appropriate for all cases.[9] Because underinsured motorist claims are sui generis, we need to go beyond labels in resolving the question posed by this case.[10] Put another way, the question is not whether underinsured motorist

---

[9] The plaintiff relies upon *Pecker* v. *Aetna Casualty & Surety Co.*, 171 Conn. 443, 370 A.2d 1006 (1976), to support her argument that underinsured motorist payments are purely contractual in nature, and thus that the collateral source rule should apply. In *Pecker*, we held that "an insurer making payment under the [under]insured motorist coverage provisions of its policy makes that payment 'on behalf of' the insured, not the uninsured motorist." Id., 452; see also Regs., Conn. State Agencies § 38a-334-6 (a). We do not dispute that, because they are based on the insured's contract with her underinsured carrier, the benefits are paid on her behalf. This fact, however, in and of itself, is not dispositive of the manner in which we should treat such payments in the context of the present case. Even if they are made *"on behalf of"* the insured, underinsured motorist payments are still exclusively *premised upon* a third party's tort liability. *Pecker*, therefore, does not resolve the fundamental tension caused by the hybrid nature of underinsured motorist coverage.

[10] Indeed, the peculiar hybrid nature of underinsured motorist insurance limits the utility of broad statements of policy, such as those found in the Restatement of Judgments and the Restatement of Torts. For example, the Restatement of Judgments notes that, with regard to the tension between the collateral source rule and the principle against double recovery for the same loss, "[w]hich one of those concepts governs depends on whether the person providing the payments in question is assimilated to a co-obligor of the judgment debtor or to a *casualty insurer* of the injured party." (Emphasis added.) 2 Restatement (Second), Judgments § 50, comment (e) (1982). As previously observed, however, underinsured motorist coverage is unlike casualty insurance, which pays for the loss irrespective of who is legally liable for the loss.

Similarly, the Restatement of Torts directs that "[p]ayments made by one who is not himself liable as a joint tortfeasor will go to diminish the claim of the injured person against others responsible for the same harm *if they are made in compensation of that claim*, as distinguished from payments from collateral sources such as *insurance*, sick benefits, donated medical or nursing services, voluntary continuance of wages by an employer, and the like." (Emphasis added.) 4 Restatement (Second), Torts § 885 (3), comment (f) (1979). The reference to "insurance," however, does not provide real guidance for the question before us. Although life and medical insurance, for example, are likely contemplated by this reference, they are types of insurance that, unlike underinsured motorist coverage, do not depend on proof of an underlying tort and do not act as a surrogate for the tortfeasor's liability coverage. Indeed, because underinsured motorist payments *do* act as a surrogate for tort liability, they *can* reasonably be seen as being made

benefits *are* a collateral source; the question is whether they *should be treated* as a collateral source, in the present factual context. We must, therefore, examine the purpose that underinsured motorist coverage is meant to serve, and decide how, as a matter of policy, including consistency with related legal principles, that specific type of insurance should be treated. We conclude that, for the particular purpose of characterizing underinsured motorist payments, the relationship in the present case between the underinsured carrier and the defendant may be viewed as analogous to that of joint tortfeasors,[11] and thus that the general tort rule precluding double recovery from joint tortfeasors should apply.

We begin with the fundamental principle that the purpose of underinsured motorist insurance is to place the insured in the *same* position as, but *no better* position than, the insured would have been had the underinsured tortfeasor been fully insured. "The public policy established by the [under]insured motorist statute is that every insured is entitled to recover for the damages he or she would have been able to recover if the [under]-insured motorist had maintained [an adequate] policy of liability insurance." (Internal quotation marks omitted.)

"in compensation of" the underlying tort injury. Accordingly, this passage can be read both as supporting and precluding the plaintiff's recovery against the defendants in the present case, depending on which portion of the passage one emphasizes.

[11] Under the plaintiff's allegations against the defendants in the present case, it is clear that the underinsured motorist tortfeasor himself and the defendants were joint tortfeasors because the decedent did not die solely from her injuries from the accident, but also because of the defendants' alleged negligence. Analytically, in terms of basic tort principles, the underinsured motorist's conduct was a proximate cause of the death, and another, concurrent proximate cause was the defendants' alleged negligence. The underinsured motorist carrier was liable for the entire wrongful death damages of $650,000, reduced by the $20,000 collected from the tortfeasor's liability carrier, only because the defendants' subsequent negligence was not, under the plaintiff's allegations, an independent, intervening cause that cut off the underinsured motorist's negligence.

*Rydingsword* v. *Liberty Mutual Ins. Co.*, 224 Conn. 8, 18, 615 A.2d 1032 (1992); see also *Williams* v. *State Farm Mutual Automobile Ins. Co.*, supra, 229 Conn. 366–67; *Smith* v. *Safeco Ins. Co. of America*, 225 Conn. 566, 573, 624 A.2d 892 (1993). The plaintiff's argument, however, would have her recover *more* than her full damages—indeed, that is the whole point of her action against the defendants—*solely* because of her decedent's underinsured motorist coverage. For example, had the tortfeasor motorist *not* been underinsured, but instead had he had adequate liability insurance, the plaintiff would have been required to bring an action against both that tortfeasor and the defendants in order to recover $650,000 for her decedent's death,[12] which would be assessable against either or both the defendants' and the motorist's liability carrier. In that scenario, the plaintiff could have recovered, from either or both the tortfeasor and these defendants, a *total* of $650,000 *and no more*. As the plaintiff conceded in this court, she could not have proceeded against her decedent's underinsured motorist carrier at that point. Under the plaintiff's argument, however, she is in a *better* position because her decedent had been struck by an underinsured driver than she would have been had the same driver been fully insured. Pursuant to the plaintiff's argument, she can recover $650,000 against her decedent's underinsured motorist insurance carrier, and then recover additional compensation from the defendants. This increase in compensation is contrary to the fundamental purpose of underinsured motorist coverage.[13] See *Gionfriddo* v. *Gartenhaus Cafe*, 211

[12] For convenience, we carry the damages for the decedent's death in this case over into our hypothetical.

[13] At oral argument, the plaintiff attempted to avoid this double recovery problem by reference to § 38a-334-6 (e) of the Regulations of Connecticut State Agencies, which provides: "Recovery over. The insurer may require the insured to hold in trust all rights against third parties or to exercise such rights after the insurer has paid any claim, provided that the insurer shall not acquire by assignment, prior to settlement or judgment, its insured's

Conn. 67, 71–72, 557 A.2d 540 (1989) (applying no double recovery principle to bar action under Dram Shop Act where plaintiff had already recovered full measure of damages from other, unrelated tortfeasor).[14]

Furthermore, the plaintiff's putative right to recover against the defendants in the present case, for the loss that her decedent's underinsured motorist carrier has already paid, depends *solely* on the order of litigation in this case. This point can be illustrated by a simple

right of action to recover for bodily injury from any third party." The plaintiff argues that this regulation would allow Covenant to seek reimbursement or restitution from the plaintiff, should the plaintiff prevail in her case against the defendants subsequent to receiving payment from Covenant, and, moreover, that barring the plaintiff from pursuing her claim against the defendants would effectively nullify the regulation.

The problem with the plaintiff's position is that, as the plaintiff acknowledged at oral argument, this court has never decided whether this regulation permits an underinsured motorist carrier that has paid benefits to its insured, in a case such as this, to create in its policy a right over, not only against the underinsured motorist whose conduct was the risk that was insured against, but against a different, joint tortfeasor. Cf. *Westchester Fire Ins. Co.* v. *Allstate Ins. Co.*, 236 Conn. 362, 672 A.2d 939 (1996). We need not decide that question until a case presents it, which the present case does not. The plaintiff has nowhere alleged, nor is there any indication in the record, that such a subrogation or reimbursement clause was contained in the decedent's contract with Covenant. Accordingly, whether the existence of such a clause *could have* obviated the present double recovery problem is not before the court in this case. Our conclusion, however, that, in the *absence* of such a clause, there *is* a double recovery problem does not bear on the effect of the regulation when such a clause is present. If there *were* such a clause, however, and if it did operate against the defendants in this case as the plaintiff suggests, the net effect would still be that the plaintiff would recover nothing further, because she would be required to hold the proceeds of her action against the defendants "in trust" for Covenant.

[14] In *Gionfriddo* v. *Gartenhaus Cafe*, supra, 211 Conn. 71–72, we relied on the principle, recognized since at least 1863, that "[t]he possible rendition of multiple judgments does not . . . defeat the proposition that a litigant may recover just damages only once." Indeed, in *Gionfriddo* we recognized that the principle against double recovery for the same loss applies in both tort and contract law. See id., 74 n.9. To the extent, therefore, that the present case involves both contract law—the contract of underinsured motorist coverage—and tort law—the action against the defendants—the same principle against double recovery should apply.

hypothetical. Suppose that after the accident in this case, the tortfeasor motorist's insurance company had refused to pay the last dollar of the motorist's $20,000 coverage. In order to satisfy the exhaustion doctrine; see *Ciarelli* v. *Commercial Union Ins. Cos.*, 234 Conn. 807, 811, 663 A.2d 377 (1995); the plaintiff would have been required to bring an action against the underinsured motorist. Undoubtedly, at the same time she would have brought an action against these defendants as well, as joint tortfeasors. Under the damages in this case, the plaintiff would have been awarded a total judgment of $650,000. That judgment would have been satisfied by these defendants, or their insurers, paying $630,000 and the underinsured motorist's liability carrier paying $20,000. In that situation, as the plaintiff acknowledged in oral argument, the plaintiff would not then have been able to make an additional claim for underinsured motorist benefits under her own policy. Thus, under that scenario, the plaintiff would recover a total of $650,000, and no more.

The only difference between the actual facts and the aforementioned hypothetical situation is the order of litigation—that is, whether the plaintiff brings an action against the defendants, before or after she recovers pursuant to her decedent's underinsured motorist policy. Under the plaintiff's argument, however, when she pursues her underinsured motorist policy *first*, as she in fact did, she can recover, not only the $650,000 that she received from her decedent's underinsured motorist carrier, but an *additional* amount for the same damages when she then brings an action against the defendants. Had the exact same claims been presented in a different order, however—namely, an action against the defendants *first*, rather than *second*—she agrees that she could recover only a total of $650,000. Stating the plaintiff's position in this manner demonstrates why it must fail, for it would be bizarre to say that the law permits

a double recovery depending on the order of litigation of the plaintiff's claims. Cf. *Hall* v. *Gilbert & Bennett Mfg. Co.*, 241 Conn. 282, 302, 695 A.2d 1051 (1997). Put another way, it cannot be the law that underinsured motorist benefits are, or are not, a "collateral source" depending solely on *when* they are sought.[15]

Finally, the equities do not weigh substantially in favor of the plaintiff's position. Precluding the plaintiff from obtaining double recovery does not deprive the decedent of the benefit for which she paid her underinsured motorist premium, namely, a guaranteed recovery of her wrongful death damages, subject to contractual limits, despite the fact that she was hit by an underinsured motorist, and whether there was a joint tortfeasor who could also be held liable. The only thing she is deprived of is the opportunity to recover *more* than she paid for. Moreover, although we acknowledge the general notion that a defendant, if indeed negligent, should be held accountable, our conclusion does not create an inappropriate windfall for the defendants. It is no more of a windfall to the defendants in this case to bar recovery against them than it was a windfall to the nightclub in *Gionfriddo* to bar recovery against it. *Whenever* the principle against double recovery is applied as between various tortfeasors, or tortfeasor surrogates, one of the parties escapes at least some degree of liability. In such cases, however, the policy behind the fundamental principle barring double recovery; see footnote 6 of this opinion; simply is deemed to outweigh the policy behind the collateral source rule. See footnote 7 of this opinion. Such a consequence is,

---

[15] Of course, one could also resolve the order of litigation problem by, instead of *precluding* double recovery whatever the order of litigation, as we choose to do, *allowing* the plaintiff to maintain her additional claim against the underinsured motorist carrier even after receiving full compensation from the two tortfeasors. The plaintiff does not, however, argue for such a rule. In any event, we believe that that would be an even more bizarre result than what the plaintiff *is* seeking.

therefore, not a windfall under the law, but rather a necessary consequence of a fundamental policy choice. See *RK Constructors, Inc.* v. *Fusco Corp.*, 231 Conn. 381, 386, 650 A.2d 153 (1994).

## II

We next address the issue of whether the plaintiff's CUTPA count against Yale-New Haven sufficiently stated a claim pursuant to § 42-110a et seq.[16] The trial court rendered summary judgment on this count because it concluded that the second count of the plaintiff's complaint was merely a negligence claim recast as a CUTPA claim and that it was therefore legally insufficient.[17] The plaintiff argues that her allegations of negligence can support a CUTPA claim because Yale-New Haven held itself out to be a major trauma center even though it allegedly did not meet those standards. We disagree.

We previously have concluded "that the provision of medical services falls within CUTPA's definition of trade or commerce as 'the distribution of any services . . . .' General Statutes § 42-110a (4)." *Fink* v. *Golenbock*, 238 Conn. 183, 213, 680 A.2d 1243 (1996). *Fink,*

---

[16] General Statutes § 42-110b (a) provides: "No person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."

General Statutes § 42-110g (a) provides: "Any person who suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment of a method, act or practice prohibited by section 42-110b, may bring an action in the judicial district in which the plaintiff or defendant resides or has his principal place of business or is doing business, to recover actual damages. Proof of public interest or public injury shall not be required in any action brought under this section. The court may, in its discretion, award punitive damages and may provide such equitable relief as it deems necessary or proper."

[17] We review this issue, as the plaintiff and the defendants did in their arguments before this court, as if the motion for summary judgment were a motion to strike testing the legal sufficiency of the allegations of the CUTPA claim. Accordingly, we decide the issue raised by the parties as if the allegations of fact were true.

however, was based upon the entrepreneurial or business aspects of providing medical services. Id., 185–88. In *Fink*, the dispute that gave rise to a violation of CUTPA involved a situation in which "the defendant took certain actions designed to usurp the business and clientele of one [professional] corporation in favor of another . . . [that] placed him in direct competition with the interests of the [professional] corporation." (Citations omitted; internal quotation marks omitted.) Id., 212–13.

The trial court in the present case, relying on *A-G Foods, Inc.* v. *Pepperidge Farm, Inc.*, 216 Conn. 200, 217, 579 A.2d 69 (1990), held that negligence could not be a basis for a CUTPA claim. The trial court then determined that the allegations were based solely on negligence and rendered summary judgment. We agree with the trial court that the plaintiff's CUTPA count does not allege a sufficient cause of action, but for different reasons.

In *A-G Foods, Inc.*, we held that "the first prong [of the 'cigarette rule'], standing alone, is insufficient to support a CUTPA violation, at least when the underlying claim is grounded solely in negligence." Id.[18] We agreed

[18] "In determining whether certain acts constitute a violation of [CUTPA], we have adopted the criteria set out in the *cigarette rule* by the federal trade commission . . . (1) [W]hether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise—whether, in other words, it is within at least the penumbra of some common law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers [(competitors or other businessmen)]." (Emphasis added; internal quotation marks omitted.) *Williams Ford, Inc.* v. *Hartford Courant Co.*, 232 Conn. 559, 591, 657 A.2d 212 (1995).

We have previously noted that "[a]ll three criteria do not need to be satisfied to support a finding of unfairness. A practice may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three. . . . Thus a violation of CUTPA may be established by showing either an actual deceptive practice . . . or a practice amounting to a violation of public policy. . . . Furthermore, a party need not prove

with the defendant in *A-G Foods, Inc.*, that "its negligence was not an unfair or deceptive trade practice within the meaning of General Statutes § 42-110b (a)." Id., 215. We also stated that "[c]learly [the defendant's] negligence did not constitute an 'immoral, unethical, oppressive or unscrupulous' practice." Id., 216–17. Subsequently, this court stated that *A-G Foods, Inc.*, stands for the proposition "that there is no CUTPA violation when the sole basis of the claim is the defendant's negligence and the jury determines that the plaintiff was contributorily negligent." *Williams Ford, Inc.* v. *Hartford Courant Co.*, 232 Conn. 559, 591, 657 A.2d 212 (1995). In *Williams Ford, Inc.*, however, we made clear that we did not decide "whether negligence of the defendant alone, unaccompanied by contributory negligence of the plaintiff, [could] establish a CUTPA violation" because the plaintiffs in *Williams Ford, Inc.* were found to have been contributorily negligent.[19] Id., 591 n.25. Indeed, we specifically left that issue open for another day. Id. Likewise, in the present case we do not decide whether negligence alone is sufficient to support a CUTPA violation.

We conclude that professional negligence—that is, malpractice—does not fall under CUTPA. Although physicians and other health care providers are subject to CUTPA, only the entrepreneurial or commercial aspects of the profession are covered, just as only the entrepreneurial aspects of the practice of law are covered by CUTPA. "Although an attorney is not exempt from CUTPA; *Heslin* v. *Connecticut Law Clinic of Trantolo & Trantolo*, 190 Conn. 510, 461 A.2d 938 (1983); we made it clear in *Heslin* that we were not deciding

an intent to deceive to prevail under CUTPA." (Internal quotation marks omitted.) *Associated Investment Co. Ltd. Partnership* v. *Williams Associates IV*, 230 Conn. 148, 155–56, 645 A.2d 505 (1994).

[19] In *Williams Ford, Inc.* v. *Hartford Courant Co.*, supra, 232 Conn. 590, 593, the underlying claim was negligent misrepresentation and the plaintiffs were found to have been 10 percent contributorily negligent.

'whether every provision of CUTPA permits regulation of every aspect of the practice of law . . . .' Id., 520. We have held that it is important not to 'interfere with the attorney's primary duty of robust representation of the interests of his or her client.' *Mozzochi* v. *Beck*, [204 Conn. 490, 497, 529 A.2d 171 (1987)]. This public policy consideration requires us to hold that CUTPA covers only the entrepreneurial or commercial aspects of the profession of law. The noncommercial aspects of law-yering—that is, the representation of the client in a legal capacity—should be excluded for public policy reasons. See *Krawczyk* v. *Stingle*, 208 Conn. 239, 246, 543 A.2d 733 (1988)." *Jackson* v. *R. G. Whipple, Inc.*, 225 Conn. 705, 730–31, 627 A.2d 374 (1993) (*Berdon, J.*, concurring).

Other jurisdictions have reached a similar result with respect to the medical profession. The Washington Court of Appeals has held that although the entrepre-neurial or commercial aspects of the practice of medi-cine are covered as "trade or commerce" under that state's consumer protection act, violations predicated on negligence or malpractice, whether legal or medical, are not covered because those claims address only com-petence. See *Quimby* v. *Fine*, 45 Wash. App. 175, 180, 724 P.2d 403 (1986) (holding that claims that relate to "actual competence of the medical practitioner" are not recognized under state's consumer protection act, but claims implicating entrepreneurial aspects of practice of medicine may be sufficient), rev. denied, 107 Wash. 2d 1032 (1987); see also *Ikuno* v. *Yip*, 912 F.2d 306, 312 (9th Cir. 1990) (applying Washington law, Court of Appeals concluded that "Washington has recognized that both the practice of law and medicine may give rise to [consumer protection act] claims. . . . These may arise, however, only when the actions at issue are chiefly concerned with 'entrepreneurial' aspects of practice, such as the solicitation of business and billing

practices, as opposed to claims directed at the 'competence of and strategy' employed by the . . . [defendant]." [Citations omitted.]); *Eriks* v. *Denver*, 118 Wash. 2d 451, 465, 824 P.2d 1207 (1992) (adopting "entrepreneurial" test from *Quimby* and applying it in legal malpractice setting); *Jaramillo* v. *Morris*, 50 Wash. App. 822, 827, 750 P.2d 1301 (relying on *Quimby* and holding that negligence claims against hospital were not cognizable under state's consumer protection act because "[t]he entrepreneurial aspects of the hospital's business, such as billing, were not implicated"), rev. denied, 110 Wash. 2d 1040 (1988); *Burnet* v. *Spokane Ambulance*, 54 Wash. App. 162, 166–67, 772 P.2d 1027 (relying on *Quimby* and *Jaramillo* in holding that negligence claims asserted against hospital did not include entrepreneurial aspect of hospital's operations, so that claims fell outside reach of state's consumer protection act), rev. denied, 113 Wash. 2d 1005 (1989).

Just recently, the Michigan Court of Appeals addressed this same issue in *Nelson* v. *Ho*, 222 Mich. App. 74, 564 N.W.2d 482 (1997). In *Nelson*, the court held that "it would be improper to view the practice of medicine as interchangeable with other commercial endeavors and apply to it concepts that originated in other areas. . . ."[20] Therefore, a blanket inclusion in the

---

[20] In *Nelson*, the Michigan Court of Appeals relied on statements made by the United States Supreme Court in *Goldfarb* v. *Virginia State Bar*, 421 U.S. 773, 786 n.15, 95 S. Ct. 2004, 44 L. Ed. 2d 572 (1975). Specifically, the Court of Appeals stated: "This theoretical distinction [between learned professions and the practice of a trade] was specifically addressed in *Goldfarb* . . . where the United States Supreme Court considered the issue of whether a minimum-fee schedule for lawyers enforced by the Virginia State Bar constituted price-fixing in violation of the Sherman Act . . . . The state bar argued that it was exempt from the Sherman Act because the practice of law was a 'learned profession,' not 'trade or commerce.' The . . . Court stated that while 'it would be unrealistic to view the practice of professions as interchangeable with other business activities, and automatically to apply to the professions antitrust concepts which originated in other areas,' [id., 788 n.17] . . . '[i]t is no disparagement of the practice of law as a profession to acknowledge that it has this business aspect.' [Id., 788]." (Citations omit-

[state consumer protection act] for physicians would also be improper. Consequently, we . . . hold that only allegations of unfair, unconscionable, or deceptive methods, acts, or practices in the conduct of the entrepreneurial, commercial, or business aspect of a physician's practice may be brought under the [consumer protection act]. Allegations that concern misconduct in the actual performance of medical services or the actual practice of medicine would be improper. We do not consider the [l]egislature's use of 'trade or commerce' in defining the application of the act to exhibit an intent to include the actual performance of medical services or the actual practice of medicine. If we were to interpret the act as such, the legislative enactments and well-developed body of law concerning medical malpractice could become obsolete. . . . Only when physicians are engaging in the entrepreneurial, commercial, or business aspect of the practice of medicine are they engaged in 'trade or commerce' within the purview of the [consumer protection act]." (Citation omitted.) Id., 83–84; see also *Gadson* v. *Newman*, 807 F. Sup. 1412, 1416 (C.D. Ill. 1992) (applying Illinois law, District Court determined that in order to bring claim against health care provider under consumer fraud act, "[t]he distinction between the business aspects [of] medicine and the 'actual practice of medicine' or the non-business aspects of medicine is crucial").

We find these decisions persuasive, and conclude that their reasoning is equally applicable to CUTPA claims. We appreciate, however, that "[i]t would be a

ted.) *Nelson* v. *Ho*, supra, 222 Mich. App. 79–80. As the Court of Appeals in *Nelson* noted, "[s]ubsequently, in *Arizona* v. *Maricopa County Medical Society*, 457 U.S. 332, 102 S. Ct. 2466, 73 L. Ed. 2d 48 (1982), the United States Supreme Court, relying in part on *Goldfarb*, struck down . . . the defendant's maximum-price schedule for fees charged by doctors for services provided" as price fixing in violation of the Sherman Act. *Nelson* v. *Ho*, supra, 80 n.3.

dangerous form of elitism, indeed, to dole out exemptions to our [consumer protection] laws merely on the basis of the educational level needed to practice a given profession, or for that matter, the impact which the profession has on society's health and welfare." *United States* v. *National Society of Professional Engineers*, 389 F. Sup. 1193, 1198 (D.D.C. 1974). A blanket exemption for the medical profession would therefore be improper. *Nelson* v. *Ho*, supra, 222 Mich. App. 83. We thus conclude that the touchstone for a legally sufficient CUTPA claim against a health care provider is an allegation that an entrepreneurial or business aspect of the provision of services is implicated, aside from medical competence or aside from medical malpractice based on the adequacy of staffing, training, equipment or support personnel. Medical malpractice claims recast as CUTPA claims cannot form the basis for a CUTPA violation. To hold otherwise would transform every claim for medical malpractice into a CUTPA claim. Accordingly, within this framework, we must review the plaintiff's allegations of CUTPA violations and look to the underlying nature of the claim to determine whether it is really a medical malpractice claim recast as a CUTPA claim.

The plaintiff alleged that Yale-New Haven was certified as a major trauma center and held itself out as such, but failed to staff the emergency department adequately, and that it failed to train and support adequately its existing staff to meet the applicable standards for a major trauma center. The plaintiff further alleged that Yale-New Haven also failed, with respect to emergency room procedures, to meet the standards for a major trauma center.[21] It is undisputed that Yale-New Haven

[21] The crux of the plaintiff's allegations in the CUTPA count are as follows: "In order best to qualify to treat such emergency and trauma patients and to draw and receive them, defendant Hospital has sought classification and holds and held itself out as a major trauma center. Nevertheless, by virtue of the inadequate, inadequately trained, and inadequately supported, staffing, and the other failures in respect of emergency and trauma patients alleged

was certified as a major trauma center. Therefore, it was not a misrepresentation when it held itself out as certified. By holding itself out as a major trauma center, however, it was representing to the public that it would meet the applicable standards of competency for a major trauma center. We conclude that this representation is simply what all physicians and health care providers represent to the public—that they are licensed and impliedly that they will meet the applicable standards of care. If they fail to meet the standard of care and harm results, the remedy is not one based upon CUTPA, but upon malpractice. The trial court properly rendered summary judgment on the CUTPA count because no unfair or deceptive practices were alleged.

The judgment is affirmed.

In this opinion CALLAHAN, C. J., and PALMER and PETERS, Js., concurred.

BERDON, J., with whom KATZ and MCDONALD, Js., join, concurring[1] and dissenting. We have recognized two fundamental rules with respect to recovery of damages in tort cases. The first is the single recovery rule—that is, a tort victim can obtain but one full recovery from joint tortfeasors for the damages he or she has sustained. The second is the collateral source rule—that is, the tortfeasor is not entitled to take advantage of the benefits received by the tort victim as a result of his or her injuries when the benefits come from a source independent of the tortfeasor. Part I of the majority's decision disregards this latter rule by shielding the defendants Yale-New Haven Hospital and Charles F. McKhann, a surgeon at the hospital, from liability and the payment of damages for their alleged

in [the medical malpractice count regarding emergency room care] . . . defendant Hospital did not duly meet the standards of such a major trauma center."

[1] I concur in the result with respect to part II of the majority opinion.

negligence in allowing the plaintiff's decedent, Barbara
S. Freeman, to bleed to death after an automobile acci-
dent. The majority insulates the defendants from liabil-
ity because Freeman had obtained and paid for a policy
of insurance that provided for underinsured motorist
protection[2] in the amount of $900,000, of which her
estate received $630,000 for her wrongful death.[3] The
basis for the majority's unusual decision is that the
$630,000 was not a true collateral source. In the words
of the majority, "underinsured motorist benefits . . .
operate in part as a liability insurance surrogate for the
underinsured motorist third party tortfeasor." Because
the majority improperly concludes that payment by the
decedent's underinsured motorist carrier was made on
behalf of the underinsured motorist tortfeasor in a "sur-
rogate" capacity, thereby treating the underinsured
motorist carrier as a joint tortfeasor, it then concludes
that the defendants can take advantage of the insurance
payment because of the single recovery rule. This blur-
ring of the collateral source and single recovery rules,
by labeling the payment received from a tort victim's
own insurance carrier as a payment on behalf of the
underinsured motorist tortfeasor, is not only contrary
to our long-standing precedent, but also flies in the face
of two recent decisions of this court; see *Mazziotti* v.
*Allstate Ins. Co.*, 240 Conn. 799, 817, 695 A.2d 1010

[2] Throughout this opinion, as in the majority opinion, references to "under-
insured" motorist coverage are intended to encompass uninsured motorist
coverage as well. Therefore, I refer only to underinsured motorist benefits,
except in places where I cite to case law and authorities specifically dealing
with uninsured motorist benefits.

[3] In the arbitration proceedings against the decedent's underinsured
motorist insurance carrier, Covenant Insurance Company (Covenant), the
decedent's estate was awarded $650,000 as the full value of the decedent's
life. Because the decedent's estate was paid $20,000 by the underinsured
motorist tortfeasor (through his liability insurance), Covenant paid the bal-
ance of $630,000. I concede that, under the single recovery rule, the $20,000
paid on behalf of the underinsured motorist tortfeasor should be deducted
from any recovery obtained against the defendants in this case.

(1997), and *Dodd* v. *Middlesex Mutual Assurance Co.*, 242 Conn. 375, 698 A.2d 859 (1997); both of which I will discuss later in this opinion.

The collateral source rule is a rule that is firmly rooted in the law of Connecticut. It "provides that a defendant is not entitled to be relieved from paying any part of the compensation due for injuries proximately resulting from his act where payment [for such injuries or damages] comes from a collateral source, wholly independent of him. . . . The basis of our well-established collateral source rule is that a wrongdoer shall not benefit from a windfall from an outside source. That rule is applicable . . . in any tort case." (Citations omitted; internal quotation marks omitted.) *Gurliacci* v. *Mayer*, 218 Conn. 531, 556–57, 590 A.2d 914 (1991); see also *Gorham* v. *Farmington Motor Inn, Inc.*, 159 Conn. 576, 580, 271 A.2d 94 (1970);[4] *Todd* v. *Malafronte*, 3 Conn. App. 16, 23, 484 A.2d 463 (1984).[5]

"Simply stated, the collateral source rule will not allow a tortfeasor to reduce his damage liability resulting from harm caused to another by benefits the injured person received from sources other than the tortfeasor himself or one acting on the tortfeasor's behalf. In essence, the collateral source rule is both a rule of damages and a rule of evidence. Its operation prevents a tort defendant from introducing evidence to prove that the plaintiff incurred no medical expenses

---

[4] "The reason for the [collateral source] rule given by a majority of the jurisdictions which have adopted it is that a 'windfall' ought not to be granted to a defendant. . . . If there must be a windfall certainly it is more just that the injured person shall profit therefrom, rather than the wrongdoer [being] relieved of his full responsibility for his wrongdoing." (Citation omitted; internal quotation marks omitted.) *Gorham* v. *Farmington Motor Inn, Inc.*, supra, 159 Conn. 580.

[5] The collateral source rule "provides that benefits received by a plaintiff from a source wholly collateral to and independent of the tortfeasor will not diminish the damages otherwise recoverable." (Internal quotation marks omitted.) *Todd* v. *Malafronte,* supra, 3 Conn. App. 23.

because the plaintiff's insurer paid them, or no wage loss because a kind employer continued wages during the disability.

"The end result of the operation of the collateral source rule is that in some cases the tort plaintiff may recover twice or more for some elements of damages— one from the tortfeasor who caused the harm and again from any source of benefits collateral to the tortfeasor. Such multiple recovery, however, is the by-product of the rule and not a principle of the rule itself nor a policy at the foundation of the rule." J. Kircher, "Insurer Subrogation in Wisconsin: The Good Hands (Or A Neighbor) in Another's Shoes," 71 Marq. L. Rev. 33, 51–52 (1987).

"The types of payments that typically come within the collateral source rule include *insurance proceeds*, medical benefits, and payments made by an employer pursuant to a statutory compensation scheme." (Emphasis added.) *Rametta* v. *Stella*, 214 Conn. 484, 490, 572 A.2d 978 (1990); see also *Apuzzo* v. *Seneco*, 178 Conn. 230, 233, 423 A.2d 866 (1979) (holding that unemployment compensation benefits received by plaintiff are collateral source and that defendant could not reduce personal injury damages because of such benefits); *Healy* v. *White*, 173 Conn. 438, 448, 378 A.2d 540 (1977) (holding that free special education services provided by state to plaintiff's child, in order to cope with needs caused by personal injuries, are collateral source and that defendants could not reduce personal injury damages because of such benefits); *Gorham* v. *Farmington Motor Inn, Inc.*, supra, 159 Conn. 579–80 (holding that medical expenses and wages paid pursuant to employment contract were collateral sources and that defendant could not reduce personal injury damages because of such benefits); *Roth* v. *Chatlos*, 97 Conn. 282, 287–88, 116 A. 332 (1922) ("The authorities, both numerically and in weight, agree that a defendant

owes to the injured compensation for injuries the proximate cause of which was his own negligence, and that their payment by third parties cannot relieve him of this obligation; and that whether the motive impelling their payment be affection, philanthropy, or contract, the injured is the beneficiary of their bounty and not him who caused the injury. In short, the defendant has no equitable or legal claim to share in the amount paid for the plaintiff."); *Regan* v. *New York & New England R. Co.*, 60 Conn. 124, 130, 22 A. 503 (1891) (holding that, where plaintiff brought claim for fire loss after allegedly being compensated by its insurer, defendant could not claim benefit from insurance because proceeds "came to the plaintiff from a collateral source, wholly independent of the defendant, and which as to him was 'res inter alios acta' ").[6]

The collateral source rule was embraced by the United States Supreme Court in 1854; see *Propeller Monticello* v. *Mollison*, 58 U.S. (17 How.) 68, 15 L. Ed. 68 (1854);[7] and has been faithfully applied in this state

---

[6] I am aware that there is a school of thought that the collateral source rule should be abandoned or restricted. Those who advocate the elimination of the collateral source rule, to the extent that a tortfeasor is relieved of all liability, however, lose sight of an important aspect of the law of torts. "The 'prophylactic' factor of preventing future harm has been quite important in the field of torts. The courts are concerned not only with compensation of the victim, but with admonition of the wrongdoer. When the decisions of the courts become known, and defendants realize that they may be held liable, there is of course a strong incentive to prevent the occurrence of the harm. Not infrequently one reason for imposing liability is the deliberate purpose of providing that incentive." W. Prosser & W. Keeton, Torts (5th Ed. 1984) § 4, p. 25. In other words, with respect to the alleged facts of this case, the policy of the law must also be concerned with discouraging further conduct of hospital emergency room personnel from negligently allowing patients to bleed to death.

[7] The United States Supreme Court first embraced what subsequently came to be known as the collateral source rule in *Propeller Monticello* v. *Mollison*, supra, 58 U.S. (17 How.) 68. In *Mollison*, the owner of a schooner, which sank after colliding with a steamship, received insurance proceeds from his own insurer and also brought a negligence action against the steamship for damages to the schooner and its cargo. The court held that

since 1891. *Regan* v. *New York & New England R. Co.*, supra, 60 Conn. 124. Nevertheless, I recognize that we also have the rule that as between joint tortfeasors, a plaintiff can only recover his or her full damages once. In *Gionfriddo* v. *Gartenhaus Cafe*, 211 Conn. 67, 71, 557 A.2d 540 (1989), we explained the single recovery principle to be a "simple and time-honored maxim that [a] plaintiff may be compensated only once for his just damages for the same injury." (Internal quotation marks omitted.) We further elaborated that this rule applies with respect to recovery from joint tortfeasors: "Plaintiffs are not foreclosed from suing multiple defendants, either jointly or separately, for injuries for which each is liable, nor are they foreclosed from obtaining multiple judgments against *joint tortfeasors.* . . . This rule is based on the sound policy that seeks to ensure that parties will recover for their damages. . . . The possible rendition of multiple judgments does not, however, defeat the proposition that a litigant may recover just damages only once. . . . Double recovery is foreclosed by the rule that only one satisfaction may be obtained for a loss that is the subject of two or more judgments." (Citations omitted; emphasis added; internal quotation marks omitted.) Id., 71–72; see also 2 Restatement (Second), Judgments § 50 (1982). That rule, as will be discussed later, is inapposite to the facts of this case.

In my view, underinsured motorist benefits fall squarely within the purview of the collateral source rule. The majority, however, holds that the payment by the decedent's underinsured motorist carrier, Covenant Insurance Company (Covenant), of the underinsured

---

"[t]he defense set up in the answer, that the [owner of the schooner has] received satisfaction from the insurers, cannot avail the [steamship]. The contract with the insurer is in the nature of a wager between third parties, with which the [steamship] has no concern. The insurer does not stand in the relation of a joint [tortfeasor], so that satisfaction accepted from [it] shall be a release of others. This is a doctrine well established at common law and received in courts of equity." Id., 70.

motorist benefits to the plaintiff was made on behalf of the underinsured motorist tortfeasor and, therefore, subject to the single recovery rule. The majority's reasoning stands underinsured motorist law on its head by transforming *the decedent's insurance,* for which she paid the premiums for coverage substantially in excess of that required by law, *into the underinsured motorist tortfeasor's* insurance. Before addressing the majority's reasoning, I first analyze why underinsured motorist benefits fit within the definition of a collateral source.

I

The Restatement of Torts and the Restatement of Judgments both define the areas occupied by the concepts of collateral sources and single recovery. The Restatement (Second) of Torts sets forth the distinction between the two concepts: "Effect of Payments Made to Injured Party[.] (1) A payment made by a tortfeasor or by a person acting for him to a person whom he has injured is credited against his tort liability, as are payments made by another who is, or believes he is, subject to the same tort liability. (2) *Payments made to or benefits conferred on the injured party from other sources are not credited against the tortfeasor's liability, although they cover all or a part of the harm for which the tortfeasor is liable.*" (Emphasis added.) 4 Restatement (Second), Torts § 920A (1979).[8]

---

[8] Section 920A, comments (a) and (b), of the Restatement (Second) of Torts (1979), highlight the distinction found in § 920A (1) and (2), providing in relevant part: "a. Payments by or for defendant. If a tort defendant makes a payment toward his tort liability, it of course has the effect of reducing that liability. This is also true of payments made under an insurance policy that is maintained *by the defendant,* whether made under a liability provision or without regard to liability, as under a medical-payments clause. This is true also of a payment *by another tortfeasor* of an amount for which he is liable jointly with the defendant or even by one who is not actually liable to the plaintiff if he is seeking to extinguish or reduce the obligation. . . .

"b. Benefits from collateral sources. Payments made to or benefits conferred by other sources are known as collateral-source benefits. They do

Comment (b) to § 920A further underscores the clearly defined nature of collateral source payments. Specifically, "*[i]f the plaintiff was himself responsible for the benefit, as by maintaining his own insurance* or by making advantageous employment arrangements, *the law allows him to keep it for himself.* If the benefit was a gift to the plaintiff from a third party or *established for him by law,* he should not be deprived of the advantage that it confers. The law does not differentiate between the nature of the benefits, so long as they did not come from the defendant or a person acting for him. One way of stating this conclusion is to say that it is the tortfeasor's responsibility to compensate for all harm that he causes, not confined to the net loss that the injured party receives. . . ." (Emphasis added.) Id., § 920A, comment (b).

Likewise, the Restatement (Second) of Judgments sets forth the clearly defined areas that those two concepts occupy: "One [concept] is that the injured party is entitled to be recompensed only once by persons chargeable with injuring him; the other is that the liability of a wrongdoer should not be diminished by the fact that provision against the loss had been made on behalf of the injured person. Which one of those concepts governs depends on whether the person providing the payments in question is assimilated to a co-obligor of the judgment debtor or to a casualty insurer of the injured party. The choice is clearly in favor of treating them as co-obligors when, for example, one was guilty of an intentional tort and the other only of negligence. The choice is clear, for the opposite conclusion, when

not have the effect of reducing the recovery against the defendant. The injured party's net loss may have been reduced correspondingly, and *to the extent that the defendant is required to pay the total amount there may be a double compensation for a part of the plaintiff's injury. But it is the position of the law that a benefit that is directed to the injured party should not be shifted so as to become a windfall for the tortfeasor.* . . ." (Emphasis added.)

the injured party himself purchased accident insurance covering the loss. Such insurance is universally held to be a 'collateral source.' In other cases, the choice involves selecting a beneficiary for a windfall." 2 Restatement (Second), Judgments § 50, comment (e) (1979).

Underinsured motorist benefits clearly fall within the collateral source rule, and do not come within the single recovery rule, because, among other reasons, they are paid as a result of a contract between the tort victim and the underinsured motorist carrier. This is so even though the damage caused by an underinsured motorist, who is legally liable for the injury to a plaintiff, provides the measuring rod for the benefits to be paid to a plaintiff.[9] I arrive at this conclusion based upon an insurance regulation of this state, our own precedent, and the overwhelming weight of authority from other jurisdictions that have addressed the issue.

The payment made under an underinsured motorist policy is clearly contractual in nature and made on behalf of the insured and not the tortfeasor. Section 38a-334-6 (a) of the Regulations of Connecticut State Agencies[10] requires the underinsured motorist carrier "to pay

[9] The harm caused by the tortfeasor is the measuring rod in most instances for the amount of damages due from a collateral source. For example, the injury caused by the tortfeasor is determinative of the number of weeks that an injured victim is unable to work. Therefore, the number of weeks of unemployment compensation, a collateral source under *Apuzzo* v. *Seneco*, supra, 178 Conn. 230, is also measured by the tortfeasor's harm.

[10] Section 38a-334-6 of the Regulations of Connecticut State Agencies provides in pertinent part: "Minimum provision for protection against uninsured motorists

"(a) Coverage. *The insurer shall undertake to pay on behalf of the insured all sums which the insured shall be legally entitled to recover as damages from the owner or operator of an uninsured motor vehicle* because of bodily injury sustained by the insured caused by an accident involving the uninsured motor vehicle. This coverage shall insure the occupants of every motor vehicle to which the bodily injury liability coverage applies. 'Uninsured motor vehicle' includes a motor vehicle insured against liability by an insurer that is or becomes insolvent. . . ." (Emphasis added.)

on behalf of the insured," and not on behalf of the tortfeasor, "all sums which the insured shall be legally entitled to recover as damages from the owner or operator of an [underinsured] motor vehicle . . . ."

Although addressed in a different context, we recently decided two cases clearly designating payments made by the underinsured/uninsured motorist carrier to its insured as contractual in nature, and, therefore, concluding in both cases that those benefits were independent of the underinsured/uninsured motorist tortfeasor. In *Mazziotti* v. *Allstate Ins. Co.*, supra, 240 Conn. 817, we held that payment to the insured under an underinsured motorist policy was contractual. In that case, we made clear that underinsured motorist benefits were made, not on behalf of the uninsured tortfeasor, but, rather, on behalf of the insured. We stated the following: "The obligation of [an] insurance carrier providing uninsured motorist coverage as a part of its liability insurance coverage on the automobile of the insured person is a contractual obligation arising under the policy of insurance. . . . Payments made pursuant to an uninsured motorist policy are paid on behalf of the insured, and not on behalf of the financially irresponsible motorist who has caused the insured's injuries. . . . The insurer is not the alter ego of the tortfeasor and, although its contractual liability is premised in part on the contingency of the tortfeasor's liability, they do not share the same legal right. The commonality of interest in proving or disproving the same facts is not enough to establish privity." (Citations omitted; internal quotation marks omitted.) Id. This proposition from *Mazziotti* was later reaffirmed in *Dodd* v. *Middlesex Mutual Assurance Co.*, supra, 242 Conn. 384–85, where the court held that an employer could not be reimbursed for workers' compensation payments made to an employee from the proceeds of

uninsured motorist benefits received by, and payable to, that employee.

Furthermore, the overwhelming weight of authority of the jurisdictions that have considered whether underinsured/uninsured motorist benefits are a collateral source have concluded that those benefits fall squarely within that rule. See, e.g., *International Sales-Rentals Leasing Co.* v. *Nearhoof,* 263 So. 2d 569, 571 (Fla. 1972) (holding that joint tortfeasor defendant does not get setoff equal to amount of recovery injured plaintiff receives from carrier of his uninsured motorist coverage); *Respess* v. *Carter,* 585 So. 2d 987, 988–90 (Fla. App. 1991) ("The broad issue presented is whether a tortfeasor should gain the benefit of proceeds from [uninsured motorist] coverage of an insurance policy, the premium for which was paid by the injured party. . . . We believe that the collateral source rule is dispositive of this case. . . . In the instant case, the general rule—recognized but not followed by the trial court in order to prevent a windfall from flowing to the plaintiffs—is that a joint tortfeasor is not entitled to setoff for amounts paid by [an uninsured motorist] carrier to the injured party. . . . We interpret the . . . trial court's order as adopting the premise that . . . the [uninsured motorist] carrier stands in the place of the driver/tortfeasor and his carrier just as though it were that driver who had secured the insurance and paid the premium. This is incorrect. . . . [An uninsured motorist] carrier is neither a tortfeasor nor an insurer thereof. . . . The general principle stated . . . is that the collateral source rule precludes a setoff of [uninsured motorist] benefits." [Citations omitted; internal quotation marks omitted.]); *State Farm Mutual Automobile Ins. Co.* v. *Board of Regents of the University System of Georgia,* 226 Ga. 310, 311, 174 S.E.2d 920 (1970) (uninsured motorist benefits "do not discharge . . . the liability of the uninsured motorist and cannot be pleaded

in defense of an action by the injured party against the uninsured motorist"); *Beaird* v. *Brown*, 58 Ill. App. 3d 18, 21, 373 N.E.2d 1055 (1978) ("[W]e find that payments received by the plaintiffs pursuant to their uninsured motorist coverage were received from a collateral source. . . . Were the plaintiffs to seek recovery from their insurer, such a recovery would be based on contract law and would be made possible by the insured's payment of premiums. On the other hand, a recovery against the uninsured motorist would be founded in tort law. . . . To allow the defendant to reduce his liability because the plaintiffs exercised a contract right of recovery against their insurer [for uninsured motorist benefits], a right for which the plaintiffs paid consideration in the form of premiums, would be an unjust enrichment of the defendant." [Citations omitted; internal quotation marks omitted.]); *Southard* v. *Lira*, 212 Kan. 763, 770, 512 P.2d 409 (1973) ("A tort-feasor cannot diminish the amount of his liability by pleading payments made to the plaintiff under the terms of a contract between the plaintiff and a third party who was not a joint tort-feasor. . . . Nor are payments made by an insurance carrier under uninsured motorist coverage, payments which a tort-feasor can utilize to diminish the amount of his liability to the injured party."); *Jones* v. *Smith*, 1 Kan. App. 2d 331, 334, 564 P.2d 574 (1977) (finding that rule in *Southard* was controlling and holding that "[t]he mere fact that [the plaintiff] obtained uninsured benefits from her own insurance company does not prevent her from maintaining a cause of action against the tort-feasor. . . . The only drawback is that, in the event [that the plaintiff] recovers from the lawsuit, she must subrogate her insurance company from the proceeds."); *Hagedorn* v. *Adams*, 854 S.W.2d 470, 479 (Mo. App. 1993) ("The collateral source rule is applicable to uninsured motorist payments made under a policy of insurance by the insured's own insurance company

to the insured for which the insured has paid a premium. . . . [P]ayment of the uninsured motorist coverage is from a source collateral of the wrongdoer." [Citation omitted.]); *Weatherly* v. *Flournoy*, 929 P.2d 296, 299 (Okla. App. 1996) ("[W]e find that a tortfeasor may not set-off any amount he is found to owe the injured party by any amount the injured party may have received from his own uninsured/underinsured motorist policy. The tortfeasor should not benefit from a policy held and paid for by the injured party."); *Estate of Rattenni* v. *Grainger*, 298 S.C. 276, 278, 379 S.E.2d 890 (1989) ("[w]e find no persuasive reason to distinguish underinsurance proceeds from other insurance proceeds that are subject to the collateral source rule"); *Bradley* v. *H.A. Manosh Corp.*, 157 Vt. 477, 484–85, 601 A.2d 978 (1991) ("[I]t might seem that a tortfeasor, such as [the] defendant, ought to be allowed to subtract from a damages award any settlement the plaintiff receives from an insurer standing jointly liable with an uninsured motorist. Such a result cannot be justified, however. . . . [T]he [uninsured motorist] carrier has a status different from that of insurance carriers who represent other tortfeasors. Their contractual obligation is to persons allegedly at fault, whereas the contractual obligation of the [uninsured motorist] carrier is to the injured party." [Citations omitted; internal quotation marks omitted.]); *Johnson* v. *General Motors Corp.*, 190 W. Va. 236, 244, 438 S.E.2d 28 (1993) ("In the case before us, it would be unfair for [the defendant] to minimize its damages by offsetting the underinsurance settlement the [plaintiffs] received as a result of their own contractual arrangements. Accordingly, we hold that the collateral source rule operates to preclude the offsetting of uninsured or underinsured benefits since the benefits are the result of a contractual arrangement which is independent of the tortfeasor . . . ."); see also *Peele* v. *Gillespie*, 658 N.E.2d 954, 957–58 (Ind. App. 1995)

(same, but collateral source rule is based on statute rather than common law).[11]

Indeed, the precise issue presented in this case has arisen in the context of several factual situations in which plaintiffs have sought damages from defendants even though the plaintiff already had recovered his or her damages in underinsured/uninsured motorist benefits. See, e.g., *Respess* v. *Carter*, supra, 585 So. 2d 988–90 (with facts similar to present case, where deceased insured's survivors settled with [uninsured motorist] carrier for $405,000 in uninsured motorist benefits, and then brought action against uninsured motorist's doctor and hospital for negligently treating and releasing uninsured motorist when he had complained of heart attack symptoms shortly before automobile accident in dispute; court held that defendants were not entitled to have setoff for benefits paid by deceased insured's uninsured motorist carrier because benefits fell within collateral source rule); *Bradley* v. *H.A. Manosh Corp.,*

---

[11] I recognize that other courts have come to different conclusions. See, e.g., *Petrella* v. *Kashlan*, 826 F.2d 1340, 1344 (3d Cir. 1987) (applying New Jersey law); *Cooper* v. *Alpin*, 523 So. 2d 339, 340–41 (Ala. 1988); *Waite* v. *Godfrey*, 106 Cal. App. 3d 760, 769–75, 163 Cal. Rptr. 881 (1980). Nonetheless, I am unpersuaded by these decisions. Indeed, *Waite* has been criticized by another California Court of Appeals case, albeit from another district, and this criticism underscores the key weakness in those cases that hold that underinsured motorist benefits are not collateral sources. In *Pacific Gas & Electric Co.* v. *Superior Court*, 28 Cal. App. 4th 174, 181–82, 33 Cal. Rptr. 2d 522 (1994), a case involving a collateral source but not underinsured motorist benefits, the court discussed the decision in *Waite*, stating: "*Waite*, using suspect analysis and ill-considered dicta . . . concluded the collateral source rule did not apply. . . . By comparing its case to one where a potential defendant's insurance would compensate the plaintiff, *Waite* changed the focus from who paid for the insurance to whose acts triggered coverage by the policy. The court concluded the settlement [claim] 'represented only a payment made on the occasion of damage inflicted by another joint tortfeasor, i.e., another wrongdoer besides [the] defendants, regardless of what carrier was the source of the payment.' . . . *Waite* failed to satisfactorily explain how it could suddenly disregard whose carrier was the source of the payments, the key point in determining if the source was collateral." (Citations omitted.)

supra, 157 Vt. 483–85 (jury awarded $250,000 in damages and defendant, employer of uninsured motorist, argued that trial court should have reduced award by $200,000 that plaintiff had received from her father's uninsured motorist policy; court held that defendant was not entitled to setoff for amount of timely payment by uninsured motorist carrier because of collateral source rule, and because through uninsured motorist statute, and most policies, "any potential windfall to the plaintiff will instead pass through to the [uninsured motorist] carrier as reimbursement for payments already made"); *Johnson* v. *General Motors Corp.*, supra, 190 W. Va. 240 n.1, 243–44 (plaintiffs received approximately $300,000 underinsured motorist settlement for automobile collision with underinsured motorist and subsequently litigated products liability claim against defendant for injuries in same accident caused by allegedly inadequate seat belt restraint system; court held that defendant could not minimize its damages by offsetting them by underinsured motorist benefits that plaintiffs received); *Hagedorn* v. *Adams*, supra, 854 S.W.2d 478–79 (plaintiff received uninsured motorist benefits in amount of $20,000 from his insurer due to collision with police vehicle while he was passenger on motorcycle driven by uninsured motorist; court held that defendant city could not obtain credit for uninsured motorist benefits paid to plaintiff because of collateral source rule).

A widely recognized treatise on underinsured/uninsured motorist insurance makes clear that those benefits are wholly independent of the tortfeasor(s): "[An] [u]ninsured [or underinsured] motorist [payment] is not for the benefit of the tortfeasor. The disposition of an uninsured [or underinsured] motorist claim generally has no relation to or effect on the liability of the uninsured motorist (or other joint tortfeasors). One reason for this is that in most states the insurer is entitled to

be subrogated to the insured's tort claim against the uninsured [or underinsured] motorist. Thus, courts have repeatedly concluded that ordinarily . . . the insurance payment does not diminish the damages that may be recovered from an uninsured [or underinsured] tortfeasor or a joint tortfeasor who is insured." 2 A. Widiss, Uninsured and Underinsured Motorist Insurance (2d Ed. 1992) § 19.11, pp. 138–39, citing *Erickson* v. *Hinckley Municipal Liquor Store*, 373 N.W.2d 318, 326 (Minn. App. 1985) ("An uninsured motorist policy is a private contract between the insured and the insurer. As such, it does not run to the benefit of [the defendant]. The policy was not purchased to protect [the defendant], it was purchased to protect . . . the insured. [The defendant] does not become a third party beneficiary to the uninsured motorist policy. . . . It is the general rule that co-tortfeasors are jointly and severally liable to injured plaintiffs.").

My conclusion that underinsured motorist benefits is a collateral source is further buttressed by General Statutes §§ 52-225a and 52-225b,[12] which provide that

[12] General Statutes § 52-225a provides: "Reduction in economic damages in personal injury and wrongful death actions for collateral source payments. (a) In any civil action, whether in tort or in contract, wherein the claimant seeks to recover damages resulting from (1) personal injury or wrongful death occurring on or after October 1, 1987, or (2) personal injury or wrongful death, arising out of the rendition of professional services by a health care provider, occurring on or after October 1, 1985, and prior to October 1, 1986, if the action was filed on or after October 1, 1987, and wherein liability is admitted or is determined by the trier of fact and damages are awarded to compensate the claimant, the court shall reduce the amount of such award which represents economic damages, as defined in subdivision (1) of subsection (a) of section 52-572h, by an amount equal to the total of amounts determined to have been paid under subsection (b) of this section less the total of amounts determined to have been paid under subsection (c) of this section, except that there shall be no reduction for (1) a collateral source for which a right of subrogation exists and (2) that amount of collateral sources equal to the reduction in the claimant's economic damages attributable to his percentage of negligence pursuant to section 52-572h.

"(b) Upon a finding of liability and an awarding of damages by the trier of fact and before the court enters judgment, the court shall receive evidence

an award of economic damages, based on personal injury or wrongful death, shall be reduced by the trial court, after liability is determined and damages are awarded, by certain enumerated payments of "collateral sources" (statutory collateral source credits) to the plaintiff. Notwithstanding this limited abrogation of the collateral source rule by statute, the legislature has, up to this point in time, chosen not to include underinsured motorist benefits in § 52-225b. This is so in spite of the fact that uninsured motorist law has existed in Connecticut since 1967,[13] underinsured motorist coverage since 1979,[14] and statutory collateral source credits were enacted in 1985.[15] Indeed, the legislature has revisited § 52-225b and its related statutes twice,[16] but has never included underinsured motorist benefits as a statutory

from the claimant and other appropriate persons concerning the total amount of collateral sources which have been paid for the benefit of the claimant as of the date the court enters judgment.

"(c) The court shall receive evidence from the claimant and any other appropriate person concerning any amount which has been paid, contributed, or forfeited, as of the date the court enters judgment, by, or on behalf of, the claimant or members of his immediate family to secure his right to any collateral source benefit which he has received as a result of such injury or death."

General Statutes § 52-225b provides: " 'Collateral sources' means any payments made to the claimant, or on his behalf, by or pursuant to: (1) *Any health or sickness insurance, automobile accident insurance that provides health benefits, and any other similar insurance benefits*, except life insurance benefits available to the claimant, whether purchased by him or provided by others; or (2) any contract or agreement of any group, organization, partnership or corporation to provide, pay for or reimburse the costs of hospital, medical, dental or other health care services. 'Collateral sources' do not include amounts received by a claimant as a settlement." (Emphasis added.)

[13] See Public Acts 1967, No. 510, § 4.

[14] See Public Acts 1979, No. 79-235.

[15] See Public Acts 1985, No. 85-574, § 1.

[16] "Number 86-338 of the 1986 Public Acts is commonly known as 'Tort Reform I,' and was codified at General Statutes (Rev. to 1987) §§ 52-225a through 52-225d, 52-251c and 52-572h. Number 87-227 of the 1987 Public Acts, commonly known as 'Tort Reform II,' revised those sections." *Childs* v. *Bainer*, 235 Conn. 107, 120 n.9, 663 A.2d 398 (1995).

collateral source credit. Surely the legislature has the power to further abrogate the common-law collateral source rule. *Warner* v. *Leslie-Elliott Constructors, Inc.,* 194 Conn. 129, 133, 479 A.2d 231 (1984). The legislature, however, has gone no further than the present version of § 52-225b, which demonstrates an intent on its part to limit the encroachment on the collateral source rule.[17]

In this case, the decedent was required by law to purchase underinsured motorist coverage in the amount of only $20,000; see General Statutes §§ 38a-336[18] and 14-112;[19] but opted to pay additional premiums for $880,000 in additional coverage. If she had carried the mandated amount of only $20,000, this case would surely not be here. To allow a defendant to receive the benefit of these underinsured motorist benefits flies in the face of the core principle behind the collateral

[17] In partially abrogating the common-law rule for certain specified collateral sources, the legislature was careful to limit these credits to provide merely a reduction against the economic damages awarded to the plaintiff by the trier of fact; see General Statutes § 52-225a (a) and (b); and subject to reducing the collateral source credit for any amount that has been paid by, or on behalf of, the plaintiff or his or her family in securing the right to the collateral source benefit—i.e., insurance premiums paid by the insured are used to offset the collateral source credit. See General Statutes § 52-225a (c). In this case, the majority does not even allow a credit for the premiums that the plaintiff's decedent was obligated to pay for the underinsured motorist coverage.

[18] General Statutes § 38a-336 provides in pertinent part: "Uninsured and underinsured motorist coverage. (a) (1) Each automobile liability insurance policy shall provide insurance, herein called uninsured and underinsured motorist coverage, in accordance with the regulations adopted pursuant to section 38a-334, with limits for bodily injury or death not less than those specified in subsection (a) of section 14-112, for the protection of persons insured thereunder who are legally entitled to recover damages from owners or operators of uninsured motor vehicles and underinsured motor vehicles and insured motor vehicles, the insurer of which becomes insolvent prior to payment of such damages, because of bodily injury, including death resulting therefrom. . . ."

[19] Pursuant to General Statutes § 14-112, the minimum coverage requirement "for damages by reason of personal injury to, or the death of, any one person, [is] twenty thousand dollars . . . ."

source rule—the public policy favoring avoidance of unjust enrichment on the part of a tortfeasor. *Gurliacci* v. *Mayer*, supra, 218 Conn. 556–57 (basis of our collateral source rule is that wrongdoer shall not benefit from windfall from source wholly independent of tortfeasor and paid to plaintiff); *Gorham* v. *Farmington Motor Inn, Inc.*, supra, 159 Conn. 580 (it is more just that injured person, rather than wrongdoer, shall profit from windfall). Furthermore, although one of the bases to justify the collateral source rule is that if there should be a windfall it should go to the tort victim, there was no windfall in the present case. The plaintiff's decedent paid insurance premiums for the $900,000 coverage year after year to protect her (or her estate) from the contingency that unfortunately occurred. In essence, the underinsured motorist insurance coverage in this case was no different than a life insurance policy, except that the amount of the payment for the death was not fixed but, rather, based upon the value of the decedent's life. Finally, "[t]he collateral source rule expresses a policy judgment in favor of encouraging citizens to purchase and maintain insurance for personal injuries and for other eventualities. . . . If [a court] were to permit a tortfeasor to mitigate damages with payments from [a] plaintiff's insurance, [the] plaintiff would be in a position inferior to that of having bought no insurance, *because his payment of premiums would have earned no benefit.*" (Emphasis added.) *Helfend* v. *Southern California Rapid Transit District*, 2 Cal. 3d 1, 10, 465 P.2d 61, 84 Cal. Rptr. 173 (1970).

## II

I now turn to the rationales that the majority advances in order to justify its decision. The overarching flaw in the majority's reasoning is that it concludes that "underinsured motorist benefits, although contractual

in nature, operate in part as a liability insurance surrogate for the underinsured motorist third party tortfeasor." The simple answer to this unfounded conclusion, as I have previously pointed out and will do so again in this part of my opinion, is that this state's insurance regulation and our established case law have rejected this "surrogate" argument. By improperly concluding that underinsured motorist benefits operate as a liability insurance surrogate for the underinsured motorist, the majority unjustifiably paves the way for its application of the common-law rule precluding double recovery for the same harm as articulated in *Gionfriddo* v. *Gartenhaus Cafe*, supra, 211 Conn. 67. Once the majority made the leap that underinsured motorist benefits are a "liability insurance surrogate" for the underinsured tortfeasor motorist, it was able to treat the underinsured motorist carrier as a joint tortfeasor, alongside the defendants, in which case the general tort rule precluding double recovery from joint tortfeasors would apply. I have no quarrel with the single recovery rule being applied faithfully to actual joint tortfeasors. But underinsured motorist carriers *are not joint tortfeasors*, and should not be viewed as such. *Gionfriddo* is distinguishable on its facts from the present case because, as a result of its sale of alcoholic liquor to the intoxicated driver who caused the fatal accident, the defendant was actually a joint tortfeasor. Id., 70. That is simply not the case here, and that underscores the fundamental flaw in the majority's opinion.[20]

---

[20] In addition, the majority considers underinsured motorist benefits "sui generis," making much of the fact that those benefits are measured by the tort damages caused by the underinsured motorist tortfeasor. The majority uses this fact to justify treating that insurance differently from more traditional types of insurance. What this approach ignores is that, although underinsured motorist insurance is prompted by statute, the relationship between insurer and insured is contractual. To show the weakness in the majority's reliance on the underinsured motorist label, I pose the following hypothetical. What if the decedent had the minimal amounts under her underinsured motorist endorsement to her automobile liability insurance

The majority, by concluding that the decedent's underinsured motorist carrier is a surrogate for the underinsured motorist tortfeasor, dismisses the plain language of § 38a-334-6 (a) of the regulations,[21] which provides that the underinsured motorist carrier "shall undertake to pay *on behalf of the insured* all sums which the insured shall be legally entitled to recover as damages from the owner or operator of an [underinsured] motor vehicle . . . ."[22] (Emphasis added.) In other words, payments of benefits by the underinsured motorist carrier are made, not on behalf of the tortfeasor, but, rather, on behalf of the insured. This is bolstered by the fact that it is the *insured* that pays the

policy and she *also* bargained separately for a second policy that would provide up to $880,000 in insurance benefits, and this insurance functioned just like underinsured motorist insurance (i.e., the measuring rod for the required payment under the policy is the damages caused by the tortfeasor). Would the majority say that this is not a collateral source because the insured and the insurer contracted for the measuring rod of the damages to be the damages caused by the tortfeasor? I think the answer is no. The fact that the insurance in this case falls under the rubric of underinsured motorist insurance should not cause it to be reclassified as a noncollateral source—in other words, a surrogate for the tortfeasor's inability to pay. The simple fact is that underinsured motorist insurance is not really any different than any other insurance that has historically been classified as a collateral source—i.e., fire insurance, commercial loss insurance, life insurance—because it is still based upon an insurance contract where the insured pays the premiums.

[21] See footnote 10 of this opinion.

[22] Section 38a-334-6 (a) of the regulations was adopted pursuant to the authority of General Statutes §§ 38a-336 (a) (1) and 38a-334. "Not only is the [insurance] commissioner obligated to adopt regulations with respect to the minimum provisions to be included in the policy of insurance issued in this state; see General Statutes § 38a-334; we presume that these regulations are 'an accurate reflection of the legislative intent articulated in the statute's more general language.' *AFSCME* v. *New Britain*, 206 Conn. 465, 470, 538 A.2d 1022 (1988). This presumption is further underscored by the Uniform Administrative Procedure Act, General Statutes § 4-166 et seq., which provides for legislative oversight through the legislative regulation review committee prior to approval of the regulations. General Statutes § 4-170." *General Accident Ins. Co.* v. *Wheeler*, 221 Conn. 206, 211, 603 A.2d 385 (1992).

premiums for the underinsured motorist coverage and not the underinsured motorist tortfeasor.[23]

Indeed, we so interpreted this regulation in *Pecker* v. *Aetna Casualty & Surety Co.*, 171 Conn. 443, 449–52, 370 A.2d 1006 (1976). In *Pecker*, we stated, in discussing whether "other insurance" clauses were valid under another provision in the regulations, that "§ 38-175a-6 (a) [of the Regulations of Connecticut State Agencies, now § 38a-334-6 (a)] clearly indicates that an insurer making payment under the uninsured motorist coverage provisions of its policy makes that payment *'on behalf of' the insured, not the uninsured motorist.*" (Emphasis added.) Id., 452. We reinforced this proposition, as I previously pointed out, in *Mazziotti* v. *Allstate Ins. Co.*, supra, 240 Conn. 817, and *Dodd* v. *Middlesex Mutual Assurance Co.*, supra, 242 Conn. 384.

The majority also reasons that the plaintiff's right to pursue her claim must fail because of what it asserts as the "fundamental principle" behind underinsured motorist insurance, namely, that the insured should not be placed in a better position than she would be in had the underinsured tortfeasor been fully insured. Simply put, the public policy behind underinsured motorist insurance does not embody this enunciated principle and the majority's assertion appears to be an overly broad generalization from our previous case law. I agree that our case law provides that "[t]he public policy established by the uninsured motorist statute is that

---

[23] Moreover, the fact that underinsured motorist benefits are mandated by statute does not take them out of the definition of a collateral source. First, only $20,000 of coverage is required by statute. Second, we have held that statutorily mandated benefits in the form of unemployment compensation benefits are a collateral source and should not be considered by the trier of fact in awarding damages. See *Apuzzo* v. *Seneco*, supra, 178 Conn. 233; see also 4 Restatement (Second), Torts § 920A, comment (c) (1979) (payments within collateral source rule are "benefits arising by statute, as in worker[s'] compensation acts" or through "[s]ocial legislation benefits . . . [such as] [s]ocial security benefits [or] welfare payments").

every insured is entitled to recover for the damages he or she would have been able to recover if the uninsured motorist had maintained [an adequate] policy of liability insurance." (Internal quotation marks omitted.) *Rydingsword* v. *Liberty Mutual Ins. Co.*, 224 Conn. 8, 18, 615 A.2d 1032 (1992); see also *Williams* v. *State Farm Mutual Automobile Ins. Co.*, 229 Conn. 359, 366–67, 641 A.2d 783 (1994); *Smith* v. *Safeco Ins. Co. of America*, 225 Conn. 566, 573, 624 A.2d 892 (1993); *Bodner* v. *United Services Automobile Assn.*, 222 Conn. 480, 499, 610 A.2d 1212 (1992). For example, we have previously held that an insured cannot recover punitive damages against its own uninsured motorist carrier, because had the uninsured motorist maintained a policy of liability insurance, the insured would not have been able to recover punitive damages from the tortfeasor's insurer; *Bodner* v. *United Services Automobile Assn.*, supra, 499–500; that the statutory collateral source credits mandated by § 52-225a limit the amount of benefits that a claimant may recover through underinsured motorist insurance, the same way that the underinsured motorist would be allowed to reduce the damages for which he or she is liable; *Smith* v. *Safeco Ins. Co. of America*, supra, 573; and that "[w]hether the uninsured motorist was legally liable must be determined in light of any substantive defenses that would have been available to the uninsured motorist." *Williams* v. *State Farm Mutual Automobile Ins. Co.*, supra, 368.

Those cases merely indicate that the insured is entitled to *no greater recovery* from his or her *underinsured motorist carrier* than he or she would have been able to recover from the underinsured motorist. See *Smith* v. *Safeco Ins. Co. of America*, supra, 225 Conn. 573 ("underinsured motorist protection is not intended to provide a greater recovery than would have been available from the tortfeasor"). The plaintiff in this case is not seeking an enhanced right of recovery from her

decedent's underinsured motorist carrier beyond that which she would have been entitled to recover from the underinsured tortfeasor. Instead, she has received insurance proceeds for which the decedent contracted with Covenant in consideration for premiums she paid. The other side of the coin, however, is that the majority's decision places the defendants in a *better position*, indeed, it gives them a windfall, just because the decedent had the foresight to purchase $880,000 more underinsured motorist insurance than the minimal $20,000 amount required by statute.

In what it finds as further support for its position, the majority asserts that the plaintiff's right to recover depends solely on the order of litigation. The thrust of the majority's reasoning is that if the plaintiff had first brought an action against the defendants, she would not be entitled to recover the underinsured motorist benefits. As I see it, the answer to that reasoning is that the contractual relationship between insurer and insured allows the insured to promptly seek benefits from its insured. The underinsured motorist carrier is required to make *prompt* payment of a claim that it finds to be clearly payable.[24] Indeed, the public policy requiring prompt payment of just claims demands no less. See generally General Statutes § 38a-815 et seq. (Connecticut Unfair Insurance Practices Act); General Statutes § 42-110a et seq. (Connecticut Unfair Trade Practices Act). The fact that the plaintiff, as administratrix of the decedent's estate, was able to recover a prompt payment, based upon the decedent's contractual arrangement with her insurer, before the plaintiff brought an action against the defendants in this case

---

[24] I recognize, of course, that an underinsured motorist carrier is only obligated to make payment "after the limits of liability under all bodily injury liability bonds or insurance policies applicable at the time of the accident have been exhausted by payment of judgments or settlements . . . ." General Statutes § 38a-336 (b).

should not be used to create a windfall for the defendants. The Vermont Supreme Court has aptly stated that "[i]t would be inequitable to allow a tortfeasor to escape liability whenever a plaintiff receives *timely* payment from [his or] her [uninsured motorist] carrier." (Emphasis added; internal quotation marks omitted.) *Bradley* v. *H.A. Manosh Corp.*, supra, 157 Vt. 485.

With respect to the order of litigation, allowing the plaintiff to recover in this case makes sense for another reason. The conclusion that underinsured motorist benefits are not a collateral source jeopardizes the subrogation rights of underinsured motorist carriers and also impermissibly interferes with the contractual relationship of the insurer and insured. An underinsured motorist carrier, based on the insurance contract or a settlement agreement, after fulfilling its duty of making prompt payment, would surely seek reimbursement of all or part of a payment if the insured later recovers from the tortfeasor. This is common practice in the world of underinsured motorist benefits. "Uninsured [or underinsured] motorist coverages usually include a provision that states the insurer has a right to be reimbursed to the extent of any payment the insurer has made." 2 A. Widiss, supra, § 19.2, p. 110.[25] In addition, "[an uninsured or underinsured motorist carrier] will often require a claimant to sign an agreement, prior to receiving any payment, which acknowledges the receipt of the insurance payment and reiterates the

[25] For example, Connecticut has § 38a-334-6 (e) of the Regulations of Connecticut State Agencies, which provides: "Recovery over. *The insurer may require the insured to hold in trust all rights against third parties or to exercise such rights after the insurer has paid any claim,* provided that the insurer shall not acquire by assignment, prior to settlement or judgment, its insured's right of action to recover for bodily injury from *any third party.*" (Emphasis added.) Although we have never decided whether this regulation would apply to nonmotorists, as the defendants are in this case, I believe that the regulation still applies because it is applicable to recovery from "any third party."

terms of the [insurance contract with respect to reimbursement] . . . ." Id., § 19.6, pp. 129–30. Nothing prevents underinsured motorist carriers from doing this. See, e.g., *Bradley* v. *H.A. Manosh Corp.*, supra, 157 Vt. 483 ("[i]n a pretrial settlement agreement, the [uninsured motorist] carrier agreed to pay [the] plaintiff $200,000, provided it would receive reimbursement up to $200,000 out of any recovery from the defendant, whom it agreed to sue jointly with [the] plaintiff"); *International Sales-Rentals Leasing Co.* v. *Nearhoof,* supra, 263 So. 2d 570 (in order to settle uninsured motorist claim, uninsured motorist carrier required plaintiffs to sign a trust agreement wherein plaintiffs agreed to "hold in trust" all rights, claims, and causes of action against any party responsible for plaintiffs' injuries and, based upon this, uninsured motorist carrier intervened in plaintiffs' action against defendant.) As the Vermont Supreme Court has pointed out, in the context of an action against an uninsured motorist's employer brought after uninsured motorist benefits were collected, "tortfeasors jointly liable with an uninsured motorist may not reduce their liability by the amount of payments made under [uninsured motorist] coverage because any potential windfall to the plaintiff will instead pass through to the [uninsured motorist] carrier as reimbursement for payments already made." *Bradley* v. *H.A. Manosh Corp.*, supra, 485.

The underinsured motorist carrier's assertion of its rights to reimbursement for payments made to an insured greatly reduces the prospects of double recovery.[26] Whether there is a double recovery on the part

---

[26] Professor Tait has noted that "[o]dd as it may seem, to reap the fruits of subrogation requires a continued recognition of the Collateral Source Rule. This is so because if the tortfeasor's liability to the plaintiff is reduced by the amount of the collateral benefits, the plaintiff will have no cause of action for that amount to which the collateral source can be subrogated." C. Tait, "Connecticut's Collateral Source Rule: Stepchild of the Law of Damages," 1 Conn. L. Rev. 93, 116 (1968). As Professor Tait aptly stated,

of the plaintiff obviously depends upon the insurance contract between the tort victim (the insured) and the underinsured motorist carrier. That, however, is a matter between the insured and the insurer. Nevertheless, the tort victim is benefited, as are insureds in general, by placing the ultimate financial responsibility upon the defendants in a case such as this one, and by allowing the tort victim's underinsured motorist carrier to be reimbursed from any recovery that the victim receives from any third party that is liable for the injuries, because the end result will be that the costs of insurance premiums for such protection will be driven down.

In sum, I conclude that the underinsured motorist benefits paid to the plaintiff as a result of the decedent's death constitute a collateral source that cannot be taken advantage of by the defendants in order to mitigate the damages for which they may be found liable. Therefore, I find that the trial court improperly rendered summary judgment on the medical malpractice count.

Accordingly, I dissent.

subrogation creates a *middle ground* between abolishing the collateral source rule and allowing absolute double recovery: "[Subrogation] offers a recognized alternative to [double recovery, a solution] that would further the basic tort principles of compensation and indemnity within the concept of fault liability. As long as . . . fault remains the keystone of our tort law, it is subrogation that merits the attention of our courts and legislature, and its adoption in appropriate new areas should help legitimize the Collateral Source Rule within the law of damages." Id., 123. I cannot agree more.