[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
NATURE OF THE CASE
This suit was brought by the plaintiff, a public adjusting firm, against William and Jill Peterken, alleging a breach of contract for their failure to pay for the services rendered by the plaintiff in adjusting a fire loss involving their residence. In four additional counts, the plaintiff has sued Ridgely W. Brown, attorney for the Peterkens, for tortious interference in the contractual relationship the plaintiff had with the Peterkens, conversion of the plaintiff's fee on receipt of the insurance payment, breach of a fiduciary duty, and various unfair trade practices.
The third count, sounding in conversion, was dismissed by the court pursuant to Mr. Brown's motion (P.B. 302) for failure to make out a prima facia case.
The defendants have pleaded seven special defenses alleging that the plaintiff is not licensed, that it is guilty of fraudulent inducement and improper solicitation, that it is not entitled to a fee from the law suit against the carrier and violations of the Home Improvement Act. The sixth and seventh special defenses address the Plaintiff's alleged representation that it would obtain a "quick enhanced settlement" and that it CT Page 10474 had a "special arrangement" with various artisans and service providers.
The defendants Peterkens have also pleaded a set-off of their counsel fees and a counterclaim encompassing a variety of grievances which allegedly caused them emotional distress.
As is obvious from even this sparse description of the pleadings, this matter proceeded ab initio in an emotionally charged atmosphere suggesting a "take no prisoners" approach by both sides.
FACTS
On July 9, 1991, at about 1PM, a fire erupted and did extensive damage to the Peterken home in Higganum, Connecticut. An employee of the plaintiff Jeffry Rubin, approached William Peterken at the scene and described the plaintiff's services to him, giving him some literature describing the same. Mr. Peterken was receptive and asked him to wait till his wife came home. Mr. Rubin remained with Mr. Peterken and then spoke to Mrs. Peterken when she arrived home from work.
A contract was signed later that day, probably after 8 PM when the Peterkens returned from voting in a town referendum and the plaintiff's employees were on the scene the next morning to begin the process of evaluating the loss. The site was secured, the cleanup commenced, and an advance payment obtained from the carrier for the Peterkens. The Peterkens were asked to determine the price and age of much of the damaged or destroyed personalty.
The insurance carrier became suspicious of the cause of the fire because of the presence of accelerants and multiple burn holes. This suspicion was heightened by the refusal of William Peterken to submit to an interview with the insurance carrier. (At trial, the defendants attempted to show that the plaintiff was the cause of the suspicions entertained by both the carrier and law enforcement personnel).
When the carrier refused to pay on the proof of loss prepared by the plaintiff, though it had been approved by its adjuster, the Peterkens brought suit against the carrier. The defendant, Attorney Brown, represented them as he had since the police and the carrier expressed their suspicions about the fire. CT Page 10475
This case was settled before trial [at a figure in excess of the fire loss] while depositions were being taken. The plaintiff claims its fee is due from this recovery. Attorney Brown, on behalf of the Peterkens, made as a condition of the settlement the carrier's issuance of the settlement check without listing the plaintiff as a co-payee. This action gave rise to some of the claims made against Mr. Brown.
It was at this point that the defendants refused to pay the plaintiff and took the position enunciated in their special defenses that the plaintiffs had no valid contract, had not performed any services, and was entitled to no fee.
BREACH OF CONTRACT
(As to the defendants William Jill Peterken)
 I
A. There is no dispute over the actual execution of a contract between the plaintiff and the defendants, William Jill Peterken. These defendants seek to invalidate the contract on a variety of grounds. The circumstances of its execution are significant, since the defendants suggest that they were unsophisticated and naive, ripe for the plucking by the "city slickers" representing the plaintiff.
Mr. Peterken is a recently admitted member of the Connecticut Bar with extensive prior experience in the audio-visual field doing engineering work to create new product and methods. He was a law student at the time of the fire. He was once sales director for a life insurance company. Mrs. Peterken most recently spent 12 years as a corporate auditor for Connecticut Blue Cross.
The plaintiff's employee, Jeffry Rubin, who solicited the contract arrived at the scene in the early afternoon and approached Mr. Peterken who was sitting in his yard. When advised of the plaintiff's services, he proceeded to discuss the situation and asked Mr. Rubin to wait for Mrs. Peterken to come home. These participants remained together and in discussion until just before 8 PM and when the Peterkens returned from voting, the contract was signed. Mr. Rubin gave Mr. Peterken some literature about the plaintiff.
Mr. Peterken acknowledged that he knew he could rescind the CT Page 10476 contract within 48 hours and Mrs. Peterken within that time spoke with a reference of the plaintiff who was also employed at Blue Cross. Mr Peterken also admitted reading from one of the plaintiffs printed forms that solicitation after 8 PM was prohibited.
The defendants special defenses are next examined in light of these circumstances.
1.) Though much energy was expended by the defendants on its first special defenses, the allegation that the plaintiff was unlicensed must fail because both Mr. Leonard and Mr. Rubin testified that they were licensed. Their testimony was not rebutted and the license of the plaintiff was produced in court.
2.) The defendants claim of fraudulent inducement in unsupported by evidence to prove that they were so influenced in entering into the contract. Mr Peterken did say he felt the plaintiff was a partnership and preferred that status to that of a corporation (the plaintiffs' legal states) because of the latter's limited liability. Were this a real concern, he could have made inquiry of Mr. Rubin, not every corporation displays or advertises its statutes on all communications and printings. And, Mr Peterken is not a creditor who has encountered corporate status as a defense or limit to recovery.
3.) The defendants also assert as a special defense that the plaintiff was guilty of improper solicitation, based on their claim that the contract was executed after 8 PM. From the evidence, it is more likely than not that this is so. However, William Peterken was aware of the prohibition on solicitation after 8PM and chose to resume discussions after he and Mrs Peterkens returned from the polling place, presumably after requesting Mr. Rubin to wait for them. It must also be considered that Mr. Rubin was apparently asked to remain in attendance from earlier in the afternoon, to await Mrs Peterken's return from work, and to remain in attendance up to the time the defendants left to go to vote.
While this prohibition is phrased in terms of no soliciting after 8 PM, the defendants have offered nothing to support an interpretation that would render all activity after 8 PM invalid. Rather, the court leans to the more reasonable and logical conclusion that the purpose of the prohibition is to protect consumers from intrusions that could extend into times normally CT Page 10477 reserved for peaceful pursuits or repose.
Finally, the plaintiff has cited the case of GiordanoAssociates v. Octavian Bucur dba Americana Dry Cleaners,
11 Conn. L. Rptr. No. 16, 516 (June 27, 1994). In that case, the court (Hodgson. J), found no statutory authority to invalidate a contract for services of a public adjuster for violations of regulations adopted pursuant to C. G. S. § 38a-788 (d).
4.) In the standard contract for the services of a public adjuster, the fee is set at 10% of "the amount of the loss when adjusted with the insurance companies or otherwise recovered." This court has addressed this issue in Biller Associates v. Rte156 Realty Co., Superior Court, J.D. of New Haven, CV-93-0348897 S, (October 22, 1996). This case is presently on appeal in the Appellate Court styled #16708.
This language from that decision is pertinent:
 "The plaintiff's fee under the contract is set at 10% of `the amount of the loss when adjusted with the Insurance Companies or otherwise recovered.' . . .
 The plaintiff claims it is entitled to recover 10% of this sum `otherwise recovered', while the defendant argues it owes the plaintiff nothing since the recovery was not on the fire policy itself.
 The language in question is dictated by statute (C.G.S. § 38a-788) and regulation (Regs. Conn. State Agencies § 38a-788-6).
 Since the phrase `otherwise recovered' in this context has not been defined by the Insurance Commissioner or interpreted by our courts, it must be construed according to the commonly approved usage of the language. C.G.S. § 1-1(a) and Wrinn v. State, 234 Conn. 401, 405 (1995).
 And, in interpreting such language, words must be given their plain and ordinary meaning. When that language is plain and unambiguous, we need look no further then the words themselves because we assume the language expresses the legislature's intent. It is basic that when a statute is clear and unambiguous, there is no room for construction. Mattatuck Museum — Mattatuck Historical Soc. v. Admin.,
CT Page 10478 238 Conn. 273, 278 (1996).
 The language before us is not complex and lends itself to only one conclusion. The adjuster is to receive `a sum equivalent to 10% of the amount of the loss', in one of two ways, with a pair of phrases, separated by `or' to qualify the meaning.
 The first qualifying phrase is `when adjusted with the Insurance Companies.' This covers the situation the parties first contemplated with the plaintiff calculating the loss and settling with the carrier.
 The second phrase defines the amount of the loss in the alternative as a sum `otherwise recovered.' Looking to the dictionary for the plain meaning of the words, `otherwise' is a common word meaning simply `in another way.' Webster's Third New International Dictionary. `Recover' means `to collect' or `to obtain in any legal manner in contrast to voluntary payment.' Black's Law Dictionary (6th ed. 1990). A sum recovered is thus any sum obtained through legal means as recompense for a loss suffered. The phrase `otherwise recovered' means simply to recover for the loss in some other way.
 When phrases are joined by `or' either one may be operative. `Or' indicates that which immediately follows . . . is something different and distinct from its antecedent language.' Zoning Commission v. Fairfield Res. Mgmt., Inc., 41 Conn. App. 89, 116 (1996). That is, the amount is determined either when adjusted or otherwise recovered, and these two terms must define different things by virtue of the use of the disjunctive `or'. This is the only `reasonable reading that may be given to this language.' Flint v. Universal Machine Co., 238 Conn. 637, 645 (1996). `A statute should be read as a whole and interpreted so as to give effect to all of its provisions.' Pintavalle v. Valkanos, 216 Conn. 412, 418
(1990). `[W]e presume that the legislature had a purpose for each sentence, clause or phrase in a legislative enactment, and that it did not intend to enact meaningless provisions.' (Internal quotation marks omitted.) CHRO v. Truelove and Maclean, Inc., supra, 238 Conn. 347. `A regulation ought to be so construed that, if it can be prevented, no clause, sentence or word shall be superfluous, void or insignificant.' Carruthers v. Vumbacco, 4 Conn. App. 168, 171, (1985). CT Page 10479
 Reading the whole sentence as the defendant wishes would render superfluous the phrase `otherwise recovered.' If the contract were limited to only those sums recovered under a fire insurance policy, there would be no need for the second phrase, because such sums are fully defined by the phrase `when adjusted with the Insurance Companies.' To interpret `otherwise recovered' as limited to recovery under a fire insurance policy would duplicate the meaning of the first phrase. The plain meaning of the phrase leaves no room for ambiguity; when read in the context of the whole sentence, the phrase means simply a recovery by some way other than an adjustment with the insurance company. The settlement with the agency would not have occurred had there not been a fire loss. The amount received by the defendant in this settlement was a sum recovered for the loss. And it was recovered `otherwise' than through an adjustment with the Insurance Companies."
Finally, the defendants allegation that to permit the plaintiff to recover a fee from the litigation against the carrier would be "unconscionable" is unsupported by evidence.
This special defense is without merit.
5.) The defendants next argue that the plaintiff has violated the Home Improvement Act. C.G.S. § 20-418 et seq. No evidence was offered to support this claim. but C.G.S. § 20-428 (4) is dispositive of the issue. That section of the statute exempts from the Home Improvement Act "any person holding a current professional or occupational license issued pursuant to the general statutes, . . . The plaintiff and its employees, Leonard and Rubin, were licensed under the statutes regulating public adjusters.
6.) This so-called special defense is puzzling to say the least. It states that the plaintiff and its agent represented that it had a special arrangement with a carpenter, etc., "all of whom came to the scene shortly after the agent represented he would call them and which bills were submitted to the Peterkens." Mr Peterken testified that he never had to pay any of these bills. This is hardly a "defense" the court can find meritorious.
7.) Finally, in a seventh special defense the defendants allege that the plaintiff promised a "quick enhanced settlement." Actually, the plaintiff's employee did effect an early settlement CT Page 10480 with the adjuster but the carrier revoked its approval because of the suspicion of arson — which the plaintiff could not control. This defense must also fail.
B. The defendants have also expressed numerous misgivings and complaints about the plaintiff and its efforts on their behalf. Meyer Biller, the principal of the plaintiff corporation, was criticized for being rude over the telephone. The defendants feel that they were asked to do too much when requested to develop the information needed to prepare an inventory of personal property destroyed or damaged. This poses the obvious question of who else would be better able to do this than the owners — the defendants?
The defendants have admitted that the plaintiff's representatives were on the scene the next day, that an electrician, carpenter and a dumpster were on hand. Boarding up and cleaning up was commenced and a monetary advance was obtained from the carrier.
Though he is now critical of the plaintiff, the court notes that Mr. Peterken did; nothing to terminate the contract until after the case was settled, though it had been decided by the defendants and counsel prior to that time that the contract was invalid because of the "improprieties." He stated he was not coerced into signing the contract and read through the plaintiff s material and the contract for 40 minutes or so. He noted that as a former car salesman, he "knew a sales pitch when he heard one." He thinks he told Mr. Rubin to wait for him at the fire scene while he and his wife went to vote. He found Mr. Leonard pleasant to deal with and Mr. Rubin to be polite.
Even after the settlement collapsed and suit was contemplated, Attorney Brown spoke with Mr. Biller and reviewed his file. When Attorney Brown sent Mr. Biller a copy of the complaint against the carrier, Mr. Biller wrote him about some errors he had detected. Mr. Brown's testimony was that he found no fault with Mr. Biller and that though their association was not "smooth" it was cordial. He had three to five conferences with Mr. Biller over the loss and discussed the early pre-suit settlement offer with him. He copied the Biller file and the plaintiff never refused to cooperate during the litigation against the carrier. He admits he sent a copy of the complaint to Mr. Biller and that Mr. Biller pointed out an error as to the court to which it was returned. On June 19, 1992 (Exhibit B5), CT Page 10481 Mr. Leonard wrote to Mr. Brown to point out a one year limitation date within which a suit against the carrier would have had to be started.
Mr. Brown also testified that his representation of the Peterkens started before he brought suit when the carrier insisted on deposing Mr. Peterken (a condition in the policy) because of the arson probe. There appears to be no question but that the proof of loss prepared by the plaintiff was utilized by Mr. Brown in the litigation and was a factor in the settlement discussions.
C.) The court concludes that on all the evidence presented, the plaintiff has proved it is entitled to recover on its contract by virtue of its breach by the Peterkens. The issue of damages will be addressed after treating with the defendants' setoff and counterclaim.
QUANTUM MERUIT
The plaintiff has also presented a claim in quantum merit, pleaded and argued in the alternative to the breach of contract. The plaintiff's brief cites Burns v. Koellmer, 11 Conn. App. 375,383 (1987):
 "Quantum meruit is the remedy available to a party when the trier of fact determines that an implied contract for services existed between the parties, and that, therefore, the plaintiff is entitled to the reasonable value of services rendered. Such contracts are determined from evidence of the parties course of conduct which implies a promise to pay for the services rendered." (citation omitted).
In this case, the plaintiff's contract was never cancelled by the defendants, nor was there ever a letter of complaint as to the progress of the claim. In fact, correspondence between the parties reflects a cordial relationship and as between Mr. Leonard and Mr. Rubin and the defendants, a most friendly relationship.
Of particular significance is the correspondence with Attorney Brown, the plaintiff's advising him as too time limitations on the claim and the plaintiffs receipt of the proposed complaint. CT Page 10482
Finally, it must be noted that the plaintiff had negotiated a settlement which was then stalled by the arson investigation and even the settlement effected by Mr. Brown was based primarily on the proof of loss and data prepared by the plaintiff.
It is obvious to the court that the plaintiff was victimized by the defendants Brown and William Peterken in adopting a strategy whereby the plaintiff was led to believe it would be paid and then when the case was settled, resorting to every conceivable avenue to develop a volume of excuses to avoid payment.
The court would find for the plaintiff on the first count in quantum meruit, absent a finding the contract was breached.
 AS TO SETOFF AND COUNTERCLAIM OF THE DEFENDANTS WILLIAM AND JILL PETERKEN
A. The setoff alleges that "because the plaintiff failed to perform the written alleged contract and/or oral representations . . ." the defendants had to hire counsel and their resulting legal fees exceed the plaintiff's claimed fee.
The defendants neither testified to nor presented other evidence to show what he plaintiff failed to do. At trial, it was claimed they had to hire counsel because of the arson investigation and that investigation was prompted by the appearance at the fire scene of Mr. Rubin.
This allegation is unsupported by the evidence and Exhibit 16, a defense exhibit, the State Police Incident Report, describes in detail why arson was suspected. Then, when Mr. Peterken appeared uncooperative and refused to give a statement under oath, the original suspicions were strengthed. The report notes that the fire marshall's office was called before arson was suspected because of the magnitude of the blaze. When the trooper from that office entered the building he discovered the evidence he regarded as suspicious.
While the presence of Mr. Rubin was noted by the investigating officers, neither the report nor their testimony indicates this was as significant as the defendants would have us believe, especially after Mr. Peterken appeared uncooperative.
Further, Attorney Brown's time records indicate he was CT Page 10483 retained on September 30, 1991 at the latest and this was long before the proof of loss was due and was rejected on the grounds an arson had occurred.
The setoff is accordingly denied.
B. As for the counter-claim many of the allegations have been dealt with by the court in the course of addressing the special defenses. The plaintiff did produce its license from the state and the employees were duly licensed. A plethora of alleged regulatory violations committed by the plaintiff were testified to and some recited in the counterclaim. Most of these were discovered by the defendants after the execution of the contract and at a time when they were seeking to avoid payment of the plaintiff's fee.
Evidence an law to support the theory that violations of the regulations invalidate a contract have not been presented. As to the contract itself, a defense witness, an employer of the Connecticut Insurance Department, stated the contract appeared to comply with state regulations.
Finally, the defendants seek damages because of the stress, and expenses of their suit, and the expenses of the suit against the carrier. At best, it would seem these claims would be premature — had the plaintiff's bill been paid, this litigation would not be in court.
As for the cost of the prior suit and its accompanying stress, the defendants and Attorney Brown persist in the bold assertion that the arrival on the scene of Mr. Rubin caused the suspicions of arson to arise.
There was no proof of this fact presented at trial. Only the statement of Fire Marshall Scott Brooks as to this occurrence even suggests it was a factor. However, the incident report (Exhibit 16) offered by the defendants clearly indicates that the very nature of the blaze caused the state fire marshall to be called and it was that office which detected accelerants and the suspicious burn patterns. Mr Peterkens refusal to give a sworn statement served to further spotlight this physical evidence.
Judgement may enter for the plaintiff Biller Associates on the counterclaims of Mr. Mrs. Peterken. CT Page 10484
 AS TO THE CLAIMS AGAINST ATTORNEY BROWN
The plaintiff has also asserted claims against Attorney Ridgely W. Brown, alleging tortious interference with a contractual relationship, breach of a fiduciary duty, and CUTPA violations. As noted earlier, the court dismissed a count alleging conversion.
It is noted at the onset that our courts have not favored claims against one party's attorney by an opposing party. In this case, the claim does not arise out of the rendering of services to the non-client, but has its origin in the relationship between the plaintiff and Mr. Brown, at a time when both were employed by the Peterkens.
A. The tortious interference count is based on Mr. Brown's actions when he instructed the insurance carrier not to include the plaintiff as a payee on the settlement check. This was accomplished by making the exclusion of the plaintiff's name a condition of the settlement in which the carrier ultimately concurred.
The Connecticut Supreme Court, in Blake v. Levy,191 Conn. 257 (1983) addresses this cause of action and at pages 260-261 states:
 "This court has long recognized a cause of action for tortious interference with contract rights or other business relations. While our cases have not focused with particularity on what acts of interference are tortious, we have made it clear that not every act that disturbs a contract or business expectancy is actionable. Jones v. O'Conell, supra, 660-61. `[F]or a plaintiff successfully to prosecute such an action it must prove that the defendant's conduct was in fact tortuous. This element may be satisfied by proof that the defendant was guilty of fraud, misrepresentation, intimidation or molestation . . . or that the defendant acted maliciously.'" (Citations omitted.)
Further, an action for intentional interference with business relations require that the plaintiff plead and prove some improper motive or means. Blake v. Levy, supra, 262.
The plaintiff's complaint contains no allegation of improper CT Page 10485 motive or means, merely stating that Brown knew of the assignment in favor of the plaintiff and interfered with said contract by inducing the insurer not to name the plaintiff as a payee.
This count is deficient and judgment must enter for the defendant.
B. The plaintiff's claim of a breach of a fiduciary duty again arises from the action by Mr. Brown in not permitting the carrier to place the plaintiff's name on the settlement check, plus the allegation that by words and deeds he mislead the plaintiff to it detriment.
An examination of the relationship of the relationship of the parties reveals that, up to the time of the settlement, the plaintiff and Brown were working together to protect the interests of the Peterkens and to obtain a recovery form the carrier. There is no evidence of the plaintiff being put on notice that Mr. Brown or the Peterkens were dissatisfied with its efforts, and as noted above in addressing the breach of contract claim, Mr. Brown described his dealings with the plaintiff as "cordial". He admitted to having at best a cursory knowledge of proofs of loss and relied on the plaintiff's preparation and submission to bring suit, negotiate and eventually settle the case. And, at one point Brown asked the plaintiff to reduce its fee and the plaintiff agreed to do so — certainly a conversation on which the plaintiff would be justified in relying as an implied promise it would be paid.
In addition, Meyer Biller testified that Mr. Brown agreed to protect the plaintiff for its fee. The court also finds it significant that the plaintiff was not advised of the settlement and learned of it from other sources, and then two letters of inquiry to Mr. Brown went unanswered.
Finally, the contents of a February 18, 1993 letter to the Peterkens (Exhibit C) is conclusive of the fact that as of that date immediately after the settlement, Mr. Brown is suggesting to his clients that the plaintiff should not be paid. (albeit his reason therefor contain inaccuracies). He also states:
 "Please note that I tried to call Biller to see if we could work something out by agreement ahead of time, but that was not possible, and we have decided to do the deal and negotiate after the fact with him . . . ." (Emphasis ours.) CT Page 10486
A further element to be factored into the picture is the contract under dispute. The contract between the parties (Exhibit A) is in the form prescribed by the state and a defense witness, an employee of the insurance department, stated it appears to comply with state requirements. This portion is applicable to this dispute:
 "In consideration for these service I/We hereby assign out of the monies due or to become due from said Insurance Companies on account of the said loss a sum equivalent to 10% (ten percent) of the amount of the loss when adjusted with the Insurance Companies or otherwise recovered"
This language of assignment places a public adjuster in a different legal position than just any creditor of the other party to the contract. This statutes is relevant to this case because of the applicability of Rule 1.15(b) of the Rules of Professional Conduct and the case law dealing with a lawyer's responsibility concerning funds or property in his custody.
"While it is true that a breach of the Rules of Professional Conduct `does not, of itself, give rise to a cause of action,' a breach of the Rules could indeed, under the right circumstances, give rise to liability in tort." Trudeau v. Gold et al., 16 Conn. L. Rptr. No. 8, 271 (April 22, 1996). (Citations omitted.)
Rule 1.15(b) is as follows:
 Upon receiving funds or other property in which a client or third person has an interest, a lawyer shall promptly notify the client or third person. Except as stated in this rule or otherwise permitted by law or by agreement with the client, a lawyer shall promptly deliver to the client or third person any funds or other property that the client or third person is entitled to receive and, upon request by the client or third person, shall promptly render a full accounting regarding such property.
The comment to this rule reads:
 Third parties, such as a client's creditors, may have just claims against funds or other property in a lawyer's custody. A lawyer may have a duty under applicable law to protect such third-party claims against wrongful interference by the CT Page 10487 client, and accordingly may refuse to surrender the property to the client. However, a lawyer should not unilaterally assume to arbitrate a dispute between the client and the third party.
A decision of the Superior Court by Judge Levine draws a distinction in such circumstances between a "just claim" or an "interest" as opposed to the claim of an unsecured creditor who had a generalized interest in all of the assets of the lawyer's client. Scharf v. Grievance Committee, 1995 Ct. Sup. 5563,14 CLR 330, (1995), J.D. of Hartford/New Britain at Hartford.
The court views the assignment language as giving the plaintiff an "interest" in the funds delivered to Mr. Brown, Thus obligating him to hold them in escrow.
However, even if the plaintiff's claim is treated as unsecured, there is the relationship of the parties prior to the settlement, forcing the conclusion that Mr. Brown misled the plaintiff to its detriment. First, there was the record of their correspondence, discussions and dealings which implied that Mr. Brown would protect the plaintiff. Finally, there is the testimony of Mr. Biller describing his conversation with Mr. Brown in which he was assured the plaintiff would be protected.
A fiduciary is "a person holding the character of a trustee, or a character analogous to that of a trustee, in respect to the trust and confidence involved in it and the scrupulous good faith and candor which it requires. A person having a duty, created by his undertaking, to act primarily for another's benefit in matters connected with such undertaking." Black's Law Dictionary.
"A fiduciary or confidential relationship is characterized by a unique degree of trust and confidence between the parties . . . ." Dunham v. Dunham, 204 Conn. 303, 322 (1987).
The court concludes that Mr. Brown was in a fiduciary position with the plaintiff when he assumed control over the settlement proceeds and that he violated that position when disbursed the funds without either holding the disputed fee in escrow or giving the plaintiff an opportunity to take steps to preserve its assignment.
Judgement may therefore enter for the plaintiff on this count. CT Page 10488
C. In it CUTPA count, the plaintiff alleges that the defendant Brown committed a series of acts "as a part of a general business practice of" interfering with contractual relationships, inducing insurers to omit payee's names, failing and refusing to pay monies, etc.
There is no evidence to support this allegation that Mr. Brown committed the acts as a general practice.
Further, our Supreme Court has recently reiteracted it position as to CUTPA claims against lawyers in Haynes v. Yale-NewHaven Hospital, 243 Conn. 17, 35 (1997):
 "We have held that it is important not to interfere with the attorney's primary duty of robust representation of the interest of his or her client Mozzochi v. Beck,
[204 Conn. 490, 497, 529 A.2d 171 (1987)]. This public policy consideration requires us to hold that CUTPA covers only the entrepreneurial or commercial aspects of the profession of law. The noncommercial aspects of lawyering — that is, the representation of the client in a legal capacity — should be excluded for public policy reasons." (citations omitted.)
The actions complained of are found not to constitute the "entrepreneurial or commercial aspects of lawyering," but rather the representation of a client in a legal capacity.
Judgement may enter for the defendant on this count.
DAMAGES
In determining the damages to be awarded, the court first looks to what the contract contemplates. As discussed above in connection with the defendant's special defense, in the absence of a routine settlement by negotiation, the court must determine what was "otherwise recovered." The settlement with the carrier after suit was brought is "otherwise recovered."
Though that amount was $362,000, Attorney Williams who represented the carrier stated the settlement comprised $335,918.00 per the proof of loss and the balance of 26,082.00 was for counsel fees, the bad faith claim, interest, etc. This proof of loss figure is also referred to in Exhibit P, wherein it is noted on April 9, 1992 that this figure has been agreed upon CT Page 10489 between the carrier's adjuster and the public adjuster.
According to the accounting (Exhibit C) prepared by Attorney Brown with respect to the settlement, Mr. Mrs Peterken received $333,511.63, a reduction of $2,407.00.
CONCLUSION
Judgement may enter for plaintiff to recover of the defendants the sum of $33,516.16, plus legal interest at the rate of 10% per annum from February 20, 1993 to the date hereof, in the amount of $15,529.14.
Anthony V. DeMayo Judge Trial Referee