[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION ON MOTION TO STRIKE
In this case, the defendant has filed a motion to strike against the second count of the complaint which alleges a violation of the Connecticut Unfair Trade Practices Act. Generally, the motion is based on an allegation that the wrongful conduct alleged in the complaint "did not arise from conduct engaged in trade or commerce as defined in the statute, and that the facts do not support a CUTPA claim under the `cigarette rule'. . ." The standard to be applied in deciding a motion to strike is well established; every favorable inference must be given to the pleading of the non-moving party. Amodio v.
CT Page 13068Cunningham, 182 Conn. 80, 82 (1980).
The second count incorporates several factual allegations of the first count. It is alleged in the second paragraph of the second count that the defendant is a corporation which owned and operated a day care center and kindergarten in Ansonia in the spring of 1997. Paragraph 3 alleges that during this time the defendant was engaged in trade and commerce in this state as defined in § 42-110(a)(4) of the General Statutes. The plaintiff parents have brought this action on their own behalf and on behalf of their minor children. In paragraph 4, it is alleged the two children were students at the day care center and the following paragraph alleges that the parents "became concerned about the quality of care being provided by the defendant to their children following the medical leave of the defendant's director." This concern was expressed orally to the defendant's staff and by letter from the children's mother to the defendant's president on May 30, 1997. Paragraph 6 of the second count alleges that, in retaliation for the previously mentioned complaints, the defendant, acting through an agent, "maliciously, in bad faith and without reasonable cause" filed a complaint with the Department of Children and Families. This complaint "falsely accused [the plaintiff parents] of sexually abusing their children."
The complaint goes on to allege that, as a result, the plaintiffs were subjected to a lengthy and intrusive investigation at which time the department concluded the charges were "unsubstantiated" and closed the state file. As a further result of the charges, the plaintiff parents were required to expend funds to hire lawyers to protect them from "the potential destruction of their family" and were caused to suffer emotional distress. (Par. 7, 8). Paragraph 10 asserts that the alleged actions of the defendant constituted unfair and deceptive acts and practices in trade and commerce as defined in § 42-110(b) of the General Statutes.
The portion of the act implicated by the factual allegations of the complaint concerns the language of § 42-110(b)(a) which states that: "No person shall engage in . . . unfair practices in the conduct of any trade or commerce." There is no claim here made by one competitor against the practices of another competitor in a particular trade nor is there a claim that a consumer was affected or harmed by deceptive acts or practices. CT Page 13069
The motion to strike takes the position that the factual allegations of the complaint as a matter of law do not set forth that an "unfair practice" occurred here in the conduct of "trade or commerce."
 (1.)
The defendant argues that there are no cases addressing the issue of whether actions of day care centers or family day care facilities fall within the purview of "unfair trade practices" or conduct while engaged in "trade or commerce." It cites cases likeHaynes v. Yale-New Haven Hospital, 243 Conn. 17 (1997) andHeslin v. Connecticut Law Clinic, 190 Conn. 510 (1983) for the proposition that only the entrepreneurial or commercial aspects of the medical and legal profession are covered by CUTPA. The defendant argues that the reasoning of those cases applies to day care centers and compels the conclusion that the present claim should not be allowed under CUTPA because it "is based on conduct not involving the entrepreneurial or commercial aspects of operating a day care center," that is, the reporting of the plaintiffs to DCF has nothing to do with trade or commerce but only with "personal animus" directed toward the plaintiffs. The duty to report possible sexual abuse of children is imposed by § 17a-101a of the General Statutes and for this reason cannot be a result of conduct that can be described as engaging in trade or commerce.
It is difficult to understand how the reasoning of cases likeHaynes (physicians and other health care providers) andHeslin (lawyers) apply to providers of day care so as to exclude CUTPA coverage. Haynes basically decided that professional negligence (malpractice) does not fall under the act.243 Conn. at p. 36. The court did not want every malpractice or negligence claim against a physician turned into a CUTPA claim. It relied on the 1997 Michigan case of Nelson v. Ito, 564 N.E.2d 482 which held that "it would be improper to view the practice of medicine as interchangeable with other commercial endeavors" — if misconduct in the actual performance of medical services were to be covered by unfair trade practice legislation, the "well developed body of law concerning medical malpractice could become obsolete." Id., p. 486. The Haynes court held at 243 Conn. page 38:
. . . The touchstone for a legally sufficient CUTPA claim against a health care provider is an allegation that CT Page 13070 an entrepreneurial or business aspect of the provision of services aside from medical competence is implicated or aside from medical malpractice based on the adequacy of staff, training, equipment or support personnel. Medical malpractice claims recast as CUTPA claims cannot form the basis for a CUTPA violation.
As noted, in dicta, the Haynes court generally held that CUTPA claims should be similarly limited against attorneys for apparently the same reasons just mentioned and also the court expressed the view that, as to attorneys, an added reason for so limiting the reach of CUTPA — the robust representation of the client by the lawyer should not be interfered with. Haynes
at 243 Conn. at pp. 34-5.
A day care center delivers a broad variety of services to children ranging from simply care taking and the provision of safe and varied play areas and supervision, educational services at various levels, and sometimes emergency medical care and health monitoring. There is no "well developed body of law" that concerns itself with the operation or staffing of such facilities. Besides the claim made here is not that the facility was poorly run but that, when inquiries were made by the consumers of the center's services raising such fears, the consumer was retaliated against. The CUTPA claim, if it goes forward, will not be about the validity or lack of validity of the plaintiff parents' concerns over the quality of care their children were receiving but whether their expressed concerns lead to the filing of false sexual abuse charges against them. Furthermore, even under cases like Haynes, it is not clear that a CUTPA claim would be barred against a health care provider or a lawyer if the claim concerned itself not with the quality of professional services delivered but with an assertion that the mere questioning of such quality by a consumer — whether appropriate or not — led to some form of retaliation.
The legislature, in § 17a-101(a), expressed an important public policy concern when it required certain "mandated reporters" to inform state authorities of suspected child abuse. But § 17a-101(e)(c) provides civil immunity for making such a report only when it is made "in good faith." Here, the allegation is made that the report to DCF was made maliciously and in bad faith.
On the motion to strike, the court must grant the complaint CT Page 13071 the most favorable inference and there is no viable public policy which would support the making of malicious and unsupported claims of child abuse to the state by a party otherwise required to make such reports. Also, there is no well developed body of malpractice law which defines the parameters of "good faith" and when such a report to the state should be made by a mandated reporter. Mandated reporters can be anyone from a physician to a teacher, pharmacist, police officers or clergyman, under § 17a-101.
Furthermore, Haynes and Heslin did not seem to say that health care providers or lawyers in their provision of services were not acting in trade or commerce as broadly and generally defined. They seemed to say that, for policy reasons, having little or nothing to do with the definitional ambit or scope of trade and commerce, we believe CUTPA should only apply to the entrepreneurial and commercial aspect of these professions and not to the manner in which they delivered their professional services.
From this perspective, a day care center operates in trade or commerce when it delivers services on a contractual basis to parents for the care of their children. In deciding whether an issue in trade or commerce is presented under the act, the transaction which is the basis of the complaint cannot be unrealistically parsed out from the setting in which it occurs. That is, the complaint here is not based on the fact that, under a state statute, the defendant was purportedly complying with its duty to report child abuse — thus it cannot be said that this act of reporting was not in trade or commerce because it was an obligation imposed by statute not arising out of trade and commerce. That is, the full transaction forming the basis of the complaint is that consumers, here the plaintiff parents, had a concern about the quality of services they had contracted for and the defendant day care business chose to respond to that concern by making a false complaint of child abuse to DCF. The whole purpose of unfair trade acts like CUTPA was to protect consumers from allegedly unfair acts by professional businesses. Lanther v.Carons, 373 N.E.2d 973, 976-977 (Mass., 1978). Thus, for example, although there has been a variety of opinions as to whether CUTPA can apply to a single transaction where the participants were not engaged in the business of making such transactions, there are many cases holding that a single transaction falls under the scrutiny of CUTPA where the defendant is a business entity engaged in the business of making such transactions or activity CT Page 13072 which forms the basis of the CUTPA violation. Dadonna v. LibertyMobile Home Sales, Inc., 209 Conn. 243, 257 (1988); Hardy v.Griffith, 41 Conn. Sup. 291 (1989); Lembo v. Schlesinger,15 Conn. App. 150, 154 (1988); Cardello v. Reves, 14 C.L.T. p. 30, cf. Wallenta v. Moscowitz, 22 CONN. L. RPTR. 428,4 Conn. Ops. 900 (1998).
The trade and commerce prerequisite have been met by the allegations of the complaint. Now the court must determine whether there are sufficient factual allegations to support a claim of "unfair acts or practices" by a consumer.
 (2.)
How is a trial court to determine whether a consumer has a viable claim of an unfair act or practice under CUTPA? The legislature sought to provide general guidance in § 42-110(b) subsection (b) of the General Statutes. There it is stated that it is the legislative intent that in construing subsection (a) of the statute, which provides consumers with a remedy for "unfair . . . acts or practices." our courts "shall be guided" by interpretations given by the Federal Trade Commission and the federal courts to 15 U.S.C. § 45a(1). That federal act empowers the commission to regulate and prescribe "unfair . . . acts or practices in or affecting commerce." Our court has at times referred to specific federal cases in trying to resolve the applicability of CUTPA, cf. McLaughlin Ford, Inc. v. Ford MotorCo., 192 Conn. 558, 566 (1984); A-G Foods, Inc. v. PepperidgeFarm, Inc., 216 Conn. 200, 217 (1990), and, of course, our court early on adopted the three pronged "cigarette rule" created by the Federal Trade Commission (FTC), 202 Conn. 234, 239 (1987), and the further elaboration of that rule by the FTC in 1980, A-GFoods, Inc. v. Pepperidge Farm Inc., supra, at 216 Conn. pp. 215-216. However, this court is not aware of any state appellate authority that indicates our courts are bound to follow federal case law nor even every pronouncement and rule of the FTC. Nor is there any indication that the relief that might be granted under CUTPA is somehow limited by the scope and ambit of relief provided by the FTC and the federal courts under the federal act. In fact, a reading of our appellate cases over the last several years indicates that, apart from general references to the "cigarette rule" there is no frequent citation of federal cases which might have faced factual scenarios similar to the ones before the appellate courts nor is there any detailed reference on a case by case basis to FTC regulations and policy decisions directed toward particular business activities adjudged to be CT Page 13073 oppressive and therefore unfair to consumers. Apparently the early view of how enforcement of CUTPA was to proceed is presently operative. In an early case, it was said the scope of CUTPA should be determined by "the gradual process of judicial inclusion and exclusion." Murphy v. McNamara,36 Conn. Sup. 183, 189 (1979).
The problem with the so-called "cigarette rule" and its 1980 FTC refinement is that it provides only "abstract guidance for resolving of individual cases", Connecticut Unfair TradePractices Act, Langer, Morgan, Belt, Belt, Vol. I, Chapter 2, page 12. The test "does little towards delineating the specific `kinds' of practices or consumer injuries which it encompasses,"American Financial Services v. FTC, 767 F.2d 957, 971 (C.A.D.C., 1985), commentators have made similar observations in referring to the 1980 modification of the "cigarette rule" which our court adopted in A-G Foods Inc.: "Without a more explicit economic focus, however, this modification still allows the FTC and the courts to roam freely in applying the unfairness doctrine," "Gellhorn, Trading Stamps, S H and the Unfairness Doctrine", 1983 Duke L.J. 903, 957; the test provides "no guidance for the identification of factors that focus and aid the reasoned determination of the issue of legality in specific situations", Rice, Consumer Unfairness at the FTC, Misadventures in Law and Economics", 52 Geo. Wash. Law Rev. 1, 56 (1984). Especially as to the second and third prongs (immoral, unscrupulous, unethical, oppressive acts — substantial injury) much can depend on the attitudes of particular judges toward the seriousness of the complained of activities. How can a "common law" definition of such broad categories of activity such as "oppressive" conduct be developed. And it is basic CUTPA law that all three prongs need not be satisfied to find a CUTPA violation. The statement in the Langer, Morgan, Belt Treatise that the way to resolve the appropriate ambit of the cigarette rule is to examine "closely analogous cases", see Chapter 2, page 14, is not satisfying at least to the extent that any case sought to be used for analogy had to formulate its reasoning from some source ab initio and what exactly was that. Not only does a problem of infinite regression present itself but if the cigarette rule is abstractly applied to the whole field of economic activity involving consumers and business, many situations will arise which do not provide analogies from prior case law.
There is less of a problem in the federal system and the development of unfair trade practice law in the federal courts CT Page 13074 because under the federal act remedial power lies exclusively with the FTC and there is no private cause of action under the federal act. Therefore federal courts deal exclusively with cases involving actions by or against the FTC. That Federal agency has had literally decades of experience to determine the effect of its action on economic activity and ascertain general patterns of consumer abuse. In deciding upon actions it takes in particular cases this experienced federal agency can avail itself of general economic studies and self generated data and investigations. The federal courts can rely upon all this expertise in weighing the scope of the federal act and what should or should not be an "unfair" act or practice as it relates to consumers under the federal act — cf the reasoning process and the court's discussion in American Financial Services v. FTC, supra at 767 F.2d pages 974-975 where court discusses "wage assignment" as collateral in consumer credit contracts and relies on "rulemaking" powers and conclusions of FTC based on studies of general economic effect of certain practices. As noted our trial courts can certainly refer to the FTC and the federal courts review of FTC actions but we are not limited apparently by the ambit and scope given unfair practices by those federal entities. Thus, individual state judges are left to their own limited resources in deciding on the existence of remedies whose enforcement may have broad economic effect.
Interestingly even with all its expertise the FTC which created the "cigarette rule" does not apply it as an abstract test to the whole of economic activity affecting consumers. The FTC has identified only four areas of activity which it deems unfair (1) withholding material information (2) making unsubstantiated advertising claims (3) using high pressure sales techniques and (4) depriving customers of various post purchase remedies, A-G Foods Inc. v. Pepperidge Farms Inc., supra216 Conn. at page 216, fn. 9, American Financial Services v. FIZ,supra, 767 F.2d at page 979, see generally 54A Am.Jur.2d § 1156, page 408 "Monopolies, Restraints of Trade and Unfair Trade Practices". This court has examined the cases collected for Title 15 U.S.C.S. § 45, United States Code Service, Lawyers Edition including the supplement and the only categories of cases falling outside these four categories are (1) situations where the FTC has found violation of the act when companies made confidential customer lists available to others or for their own use in business operations. See Beneficial Corp. , (1975), Dkt. 8922, re: Howard Enterprises, Inc., (1979, FTC) Docket No. 9096: and (2) perhaps situations where companies have threatened suit where CT Page 13075 there was no intent or practice of so doing in order to collect a debt. Slough v. FTC, 396 F.2d 870 (C.A. 5, 1968); also seeSpiegel, Inc. v. FTC, 540 F.2d 287 (C.A. 7, 1976) (these cases seem analogous to third category mentioned above — using high pressure sales tactics.)
The leading case of American Financial Services v. FTC,supra, uses broad language to the effect that "neither Congress nor the FTC has seen fit to delineate the specific `kinds' of practices which will be deemed unfair within the meaning of section 5. Instead, the FTC has adhered to its established convention, envisioned by Congress, of developing and refining its unfair practice criteria on a progressive, incremental basis." 767 F.2d at page 978. But the history of FTC activity and federal court practice raise questions about this statement. That is, the FTC has been concerned since the 1938 Wheeler Amendment with unfair practices directed at consumers and, as indicated, has only developed the previously mentioned four categories of areas of concern in which to operate. Also, American FinancialServices itself when it was examining the propriety of FTC action relative to the specific facts of the case before it, felt it necessary to fit its reasoning into the cubbyhole of the last of the four categories — the court said at page 979-980 "of particular relevance to this case are those Commission decisions dealing with the allocation of post-purchase rights." The court then proceeds to examine previous FTC activity in this area which it uses as a basis to uphold FTC action in the case before it.
If FTC rule making as evidenced in federal case law were to be the criteria applied to the allegations of this complaint there would be real question in the court's mind whether what occurred here could be an unfair trade practice. The FTC prescription against threatening suit to collect debts bears a rough analogy but here there is no allegation that the allegedly malicious and false reporting of child abuse was engaged in to enforce a preexisting debt or obligation by the plaintiffs to the defendant.
The difficulty of defining "unfair acts or practices" relating to consumers in state courts is that the application of the "cigarette rule" in our courts is not superimposed on previous FTC rule making activity as it applies to a particular case before the court nor is the "cigarette rule" superimposed upon a substratum of only certain types of cases. Also, as previously mentioned, our courts are directed to FTC and federal CT Page 13076 court activity for guidance but apparently our courts can go beyond the federal definition of unfair acts and practices. Our appellate courts have said in determining what is an "unfair act or practice" the "cigarette rule" and its 1980 supplement are to be the tests applied to the case at hand and the economic world it finds itself in. If the "cigarette rule" is thus flatly applied and an "it certainly seems bad to me test" is thus to be used, it certainly appears to the court that a prima facie CUTPA allegation is made out here. That rule is set out in McLaughlinFord, Inc. v. Ford Motor Co., 192 Conn. 558, 567-568 (1984): ". . . (1) . . . the practice, without necessarily having been previously considered unlawful, offends public policy as it has been previously established by statutes, the common law or otherwise — whether in other words, it is within at least the penumbra of some common law, statutory or other established concept of unfairness; (2) . . . it is immoral, unethical, oppressive or unscrupulous; (3) . . . it causes substantial injury to consumers. . ."
 (a.)
If the complaint is given that reading which is most favorable, required on a motion to strike, the suspect activity here cannot be confined to the filing of the complaint of child abuse with the DCF pursuant to state statute. It must be viewed in the context of the allegation that the making of the complaint was retaliation for concerns the plaintiffs expressed concerning the staffing of the defendant's facility. In this context, if a false and malicious complaint is made of child abuse, such a practice would certainly fall within the "penumbra" of a common law concept of unfairness — intentional infliction of emotional distress for example (see first count). Also, statutory policy mandate reporting of child abuse, § 17a-101(a), but interestingly enough, provides "civil immunity" only when such a report to DCF is made "in good faith". See § 17a-101(e)(c). The statutory language itself would seem to dictate a finding that the first prong of the "cigarette rule" is met.
 (b.)
As to the second prong, it is difficult to understand how such activity as that alleged is not "immoral" or "oppressive." What could be more "immoral" than making a malicious and false complaint against a parent of child abuse or more "oppressive" than threatening such a parent with activity that could lead to CT Page 13077 the loss of the child?
 (c.)
The third prong also appears to be satisfied — the type of action alleged in the complaint would appear to involve the infliction of substantial injury and here there is an allegation of substantial injury to the consumer. A false complaint of sexual abuse was allegedly made to DCF which the complaint states presented the possibility of "the potential destruction of" the plaintiffs' family.
As stated previously, our court has accepted the 1980 addendum or elucidation to the "cigarette rule" of 1964, A-GFoods Inc. v. Pepperidge Farm Inc., 216 Conn. at pp. 215-16. The policy was expressed in the form of a letter from the chairman and commissioners of the FTC to Senators Ford and Danforth. In that letter, the FTC elaborated on the third prong of "substantial" injury to consumers. The FTC said that in most cases substantial injury involves monetary harm. Although "emotional impact and other more subjective types of harm . . . will not ordinarily made a practice unfair", the letter of advisement did say that "unwarranted health and safety risks may also support a finding of unfairness." Interestingly, the CUTPA treatise by Langer Morgan and Belt notes that, in extreme cases where tangible injury can be shown, emotional distress could be considered to support a finding of unfairness — 15 U.S.C. § 1092 is cited (Fair Debt Collection Practices Act) banning, for example, harassing late night phone calls. (See Vol. II, Appendix J, fn. 16, page 268). Here, there is an allegation that the allegedly malicious complaint caused the plaintiffs to expend funds to hire a lawyer regarding the complaint to DCF and noted the complaint can be inferred to allege that the threat presented by the defendant's action would be the loss of the child to state authorities. To this court, that meets the substantial harm test.
The FTC letter of 1980 goes on to say that any claimed "substantial" injury must not be outweighed "by any offsetting consumer or competitive benefits." Under Venzina v. NautilusPools, Inc., 27 Conn. App. 810, 819 (1992), the court talks of the countervailing benefits analysis. Although the state certainly has an interest in encouraging reports of sexual abuse and indeed mandates such reporting by statute, it has no interest in encouraging such reporting when it is not made in good faith. In fact the statutory scheme explicitly fails to give civil CT Page 13078 immunity for bad faith reporting, see § 17a-101(e)(c). Two competing vitally important public policy considerations are involved — on the one hand reporting abuse of children, on the other hand the integrity of the family against what allegedly is malicious allegations. This issue certainly cannot be decided by way of a motion to strike.[1] The final factor referred to in the FTC letter of 1980 and in Venzina, itself referencing that letter, is that the injury claimed under the third prong of the "cigarette rule" must not be one that the consumer could have avoided. Giving the complaint its most favorable inference the only way the complaint to DCF could have been avoided would have been if the plaintiff parents had not complained or questioned the quality of service their child might receive due to staffing changes. This is hardly the type of non-action that the state has an interest in encouraging in the marketplace involved here —, i.e., an industry concerned with the care and fostering of young children. Not only as parents did the plaintiffs have an obligation or right to question the effect of the staff change on their child's care but the state has an interest in encouraging such actions and questioning by parents — again the court must give the complaint and its allegations every favorable inference. Using the standards set forth in the 1980 FTC letter as a guide and not being aware of any controlling state authority, the court concludes that the allegations of the complaint provide a basis for concluding that the third prong of the so-called "cigarette rule" is satisfied.
For the above stated reasons the motion to strike is denied.
Corradino, J.